The PEOPLE of the State of Colorado, Complainant,

v.

Scott D. McDOWELL, Attorney-Respondent.

No. 85SA156.

Supreme Court of Colorado, En Banc.

March 17, 1986.

Linda Donnelly, Disciplinary Prosecutor, George S. Meyer, Deputy Disciplinary Prosecutor, Denver, for complainant.

Cooper & Kelley, P.C., Bernard B. Sapp, Denver, for attorney-respondent.

QUINN, Chief Justice.

A complaint was filed with the Grievance Committee charging the respondent, Scott D. McDowell, with professional misconduct arising out of his simultaneous representation of both the seller and purchaser of a corporate business. The grievance complaint alleged that the respondent engaged in dishonesty, fraud, deceit, or misrepresentation, as well as conduct prejudicial to the administration of justice, and conduct that adversely reflected on his fitness to practice law; that he accepted employment on behalf of a client in a situation involving a conflict of interest and continued his representation of adverse or differing interests; that he handled a legal matter which he knew or should have known he was not competent to handle; and that he handled a legal matter without adequate preparation. A hearing board of the Grievance Committee determined that it could not find by

clear and convincing evidence that the respondent had engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of DR 1–102(A)(4), but did find by clear and convincing evidence that the respondent had accepted employment on behalf of a client and continued to represent the client in a situation involving a conflict of interest in violation of DR 5–105(A) and (B) and that he handled a legal matter without adequate preparation in violation of DR 6–101(A)(2).[1] The board recommended that the respondent be suspended for a period of six months, and a hearing panel of the Grievance Committee approved the findings, conclusions and recommendation of the hearing board. The respondent, pursuant to C.R.C.P. 241.20(b), filed exceptions to the report of the hearing panel, and the disciplinary prosecutor excepted to the determination that the respondent did not violate DR 1–102(A)(4). We now adopt the findings and conclusions of the hearing panel with respect to the respondent's violation of DR 5–105(A) and (B) and DR 6–101(A)(2), and we approve its recommendation of suspension. We reject, however, the determination by the hearing board and hearing panel that the respondent's conduct did not involve dishonesty, fraud, deceit, or misrepresentation in violation of DR 1–102(A)(4).

The respondent was admitted to practice law in Colorado in 1975. In 1982, Gregory Thomas agreed to purchase a corporate business, Blake Foreign Auto Parts, Inc., from Charles Fyffe. At some earlier time Thomas had been an employee of the corporation and had worked as a sales and stocking clerk. Fyffe and Thomas reached a very general agreement concerning the sale and purchase of the business and then contacted the respondent. The respondent had represented the corporation in the past and had also provided legal services to Fyffe and Thomas on prior occasions.

According to Thomas, he and Fyffe had simply given the respondent the bare essentials of their agreement to transfer the business and further advised the respondent that they wanted the sale "done right." The respondent advised the parties that as long as they had agreed in this fashion, he could prepare documents that would "protect both parties" fully. After meeting with the parties, the respondent prepared an agreement for the sale of all 4,500 shares of corporate stock to Thomas for $85,000 payable as follows: a $2,000 earnest money deposit; the assumption by Thomas of Fyffe's $8,000 promissory note to the First National Bank of Westminster; and the execution by Thomas of a $75,000 promissory note to Fyffe with interest at 10% per annum and payable at the rate of $1,500 per month. The respondent also prepared other documents including the promissory note, an escrow agreement designating himself as escrow agent for the 4,500 shares of stock while the $75,000 note was being paid off by Thomas, and some corporate minutes concerning the replacement of directors and officers.

The sale and purchase contract contained many provisions which had not been previously discussed or negotiated by the parties or explained by the respondent at or prior to closing. These terms, described as "boiler plate" by the respondent, included representations by the seller concerning the completeness and accuracy of information furnished to the buyer, the absence of any default by the corporation with respect to its contracts, the condition of electrical and mechanical systems at the corporate premises, and the good title of the seller to the corporate stock. The agreement also provided that the seller would hold the buyer harmless against any existing liabilities of the corporation and set out a pledge

---

1. At the commencement of the grievance hearing, the disciplinary prosecutor moved to dismiss the charge that the respondent engaged in conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5), and the hearing board granted the motion. At the conclusion of the People's case, the hearing board also dismissed the charge that the respondent engaged in conduct adversely reflecting on his fitness to practice law in violation of DR 1–102(A)(6). These aspects of the grievance proceedings are not before us and we therefore express no opinion on them.

arrangement giving the seller a security interest in the corporate stock until the $75,000 promissory note was paid by Thomas. In the event any "warranties" of the seller were breached, the contract provided that the buyer could remedy the breach by applying funds owed to the seller. Under the terms of the contract, the buyer was required to maintain the corporation's inventory at $85,000 for five years or until payment of the $75,000 note, and the seller was not to compete in the foreign auto parts business for two years. Although the respondent knew that three prior judgments had been entered against the corporation during the preceding year, he failed to include this information in the agreement and at no time disclosed it to Thomas.

The contract and other documents underlying the transaction contained various anomalies. The contract, for example, listed Fyffe and his wife as sellers, but a promissory note in the amount of $75,000 and payable to the order of Fyffe and his wife was signed by Fyffe in a representative capacity for Blake Foreign Auto Parts, Inc., with Thomas as an apparent co-signer. The escrow agreement referred to a promissory note for $85,000, not $75,000, and it was signed by the respondent as escrow agent, Thomas as buyer, and Blake Foreign Auto Parts, Inc., as seller.

Shortly after the closing, Thomas became aware of outstanding judgments against the corporation and learned that suppliers would not make shipments except on a COD basis. He also discovered that trade creditors were owed $20,000 and that there was a tax delinquency which subsequently resulted in a levy against the business. Thomas contacted the respondent concerning these problems and inquired whether he could withhold the monthly payments due Fyffe under the note and apply them to the outstanding trade debts. Although the contract clearly provided for this remedy, respondent was equivocal and sought a way to "make the contract work" by attempting to mediate between the parties, whom he still regarded as mutual clients.

Thomas subsequently hired another attorney to represent him, whereupon the respondent proceeded to negotiate on Fyffe's behalf with Thomas' new lawyer to obtain the most advantageous resolution for Fyffe. When Fyffe rejected the terms negotiated by the attorneys, the respondent proceeded to file a lawsuit on Fyffe's behalf against Thomas for breach of the very agreement which respondent had originally prepared for both clients.

The evidence at the grievance proceeding established that the respondent, as counsel for the corporation and its agent for service of process, was aware of three judgments totaling $8,062.90 which had been entered against the corporation during the year preceding the sale. The respondent also admitted to his simultaneous representation of both Fyffe and Thomas, but consistently denied having given legal advice to either client. He described his role in the transaction as doing what both Fyffe and Thomas told him they wanted done. He also testified that the only contractual terms mentioned to him were the names of the buyer and seller, the price and basic terms, the effective date of the transaction, and the number of shares of Blake stock outstanding. According to the respondent, he incorporated the "boiler plate" provisions in the contract in order to protect both parties. The respondent admitted that he did not discuss any potential conflict of interest with Fyffe and Thomas, nor did he discuss the legal aspects of selling and buying a business. These matters were not discussed because, in the respondent's words, Fyffe and Thomas "never asked me." Respondent further testified that he did not know how "differing interests" were defined in the Code of Professional Responsibility and that he had not even reviewed the Code in connection with the grievance proceeding.

 The above factual recitation fully supports the hearing board's conclusion that the respondent's conduct in initially agreeing to represent both Fyffe and Thomas in their respective capacities as

seller and buyer of the corporate business violated DR 5–105(A), which states:

> A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

We also agree with the board's determination that the respondent's conduct in continuing to represent both Fyffe and Thomas throughout the purchase and sale constituted a violation of DR 5–105(B), which states:

> A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

 DR 5–105(C) sets forth the conditions under which a lawyer may represent potentially conflicting interests. It states that:

> In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

The evidence in this case clearly demonstrates that both Fyffe and Thomas expected the respondent to act as more than a mere scrivener or intermediary in the sale and purchase of the corporate business.

Indeed, the contract prepared by the respondent, no less than the promissory note and the escrow agreement, went well beyond the minimal terms initially conveyed to the respondent by Fyffe and Thomas. In agreeing to represent both Fyffe and Thomas, therefore, the respondent had an obligation to fully disclose at the outset the nature of any potential conflict of interest and the possible effect of such multiple representation on the exercise of his independent professional judgment on behalf of both Fyffe and Thomas. *People v. Gibbons*, 685 P.2d 168 (Colo.1984). No such disclosure was made by the respondent.[2]

Moreover, even if the respondent had made the necessary disclosures to Fyffe and Thomas before undertaking multiple employment on their behalf, it should have immediately become obvious to the respondent that the interests of Fyffe and Thomas so conflicted that the respondent could not effectively exercise independent professional judgment on behalf of one of them without adversely affecting the interests of the other. The respondent's refusal to recognize this conflict of interests even after hostilities arose between Fyffe and Thomas demonstrates a callous disregard of the Code of Professional Responsibility, as does the respondent's filing of a claim on behalf of Fyffe against Thomas for breach of the contract which the respondent himself had prepared.

 We have no hesitation in also concluding that the respondent's handling of the sale and purchase agreement on behalf of both Fyffe and Thomas was without adequate preparation and a clear violation of DR 6–101(A)(2). While respondent's complete insensitivity to the conflicting interests of Fyffe and Thomas would be enough to demonstrate a violation of DR

---

**2.** Although Fyffe and Thomas originally consented to the respondent's simultaneous representation of them in the sale and purchase of the corporate business, their consent was based on the respondent's assurance that he would protect their respective interests. In light of the respondent's failure to advise Fyffe and Thomas of the potential problems associated with multiple representation and the actual problems that quickly surfaced after the respondent undertook multiple representation, the initial consent of Fyffe and Thomas can in no sense be viewed as an informed consent to multiple representation by the respondent under the circumstances present here.

6–101(A)(2) under the circumstances of this case, the respondent's inadequate preparation is further evidenced by the confusing, contradictory, and erroneous documentation prepared in connection with the sale and purchase contract.

■ Finally, we sustain the disciplinary prosecutor's exception to the determination by the hearing board and hearing panel that the respondent did not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of DR 1–102(A)(4). The respondent admitted that he knew of at least three judgments which had been entered against the corporation prior to his preparation of the sale and purchase agreement for Fyffe and Thomas, but that he failed to disclose this information to Thomas. This unequivocal evidence clearly and convincingly proves that the respondent engaged in conduct violative of DR 1–102(A)(4). The respondent knowingly withheld highly material information from his client, with the result that the client was given an untrue picture of the financial condition of the business he was about to purchase. That the respondent might not have acted out of a dishonest or fraudulent motive or a subjective intent to deceive does not change the fact that he did perpetrate a misrepresentation on his client in the course of a professional relationship.

■ The respondent is accordingly suspended from the practice of law for a period of six months and is ordered to comply with the provisions of C.R.C.P. 241.21 relating to the termination of all legal matters, the giving of notice to all clients and opposing counsel, and the maintenance of appropriate records as proof of compliance. The respondent is further ordered to pay the costs of these proceedings in the amount of $1,115.19 by tendering this sum to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 500S, Dominion Plaza, Denver, Colorado, 80203, within ninety days of this date.