**The PEOPLE of the State of Colorado, Complainant,**

v.

**William M. SIMS, Jr., Attorney–Respondent.**

**No. 95SA175.**

Supreme Court of Colorado,
En Banc.

March 25, 1996

Linda Donnelly, Disciplinary Counsel, Kenneth B. Pennywell, Assistant Disciplinary Counsel, Denver, for Complainant.

Timothy A. Meinert, Dillon, for Attorney–Respondent.

PER CURIAM.

The respondent in this lawyer discipline proceeding received funds into his attorney trust account and then disbursed the funds in violation of his fiduciary duty. A hearing board recommended that he be disbarred, with readmission conditioned on satisfying a judgment against him. A hearing panel of the supreme court grievance committee approved the board's findings of fact and its recommendations. The respondent excepted to the panel's action, asserting that disbarment is too severe a sanction. Nevertheless, we accept the panel's recommendations, and order that the respondent be disbarred.

I.

The respondent was admitted to practice law in Colorado in 1960. The hearing board listened to testimony from the complainant's witnesses and from the respondent himself. The board also viewed the videotaped deposition of John Sposato taken at the federal prison where he was incarcerated. After considering the evidence, some of which was in significant conflict, the board concluded that the following had been established by clear and convincing evidence.

The respondent was a practicing lawyer from 1960 to 1970. Since 1970, the legal work he has performed has been mainly for personal matters and matters that arose in his business ventures. In 1991, the respondent was engaged in the real estate business in Summit County, Colorado. He met John Sposato in 1989, and shared a suite of offices, some staff, and equipment with Sposato during the relevant time period. Sposato was the respondent's client during this same time period.

In late 1990 or early 1991, Richard Krane and C.A. Holmen became acquainted with Sposato by telephone. The three men entered into a business transaction relating to the sale of commercial bank paper.

Krane and Holmen identified Edgar Matthews as the prospective financial investor in the transaction. Matthews, who lives in Florida, is a retired school teacher living on a pension from the Toronto, Canada, school system. Matthews had never been involved with this type of investment before, and described himself as "naive" in that regard. The hearing board specifically found Matthews to be a credible witness.

On March 8, 1991, there was a telephone call encompassing several discussions between Krane, Holmen, and Matthews, in Florida, and Sposato and the respondent, in Dillon, Colorado. The purpose of the call was to make Matthews more comfortable about the transaction before investing his money. What exactly was said during that series of conversations was disputed at the hearing, but the board found it clear that Matthews's funds were to be wired to the respondent's attorney trust account where they were to be kept until they were needed for the transaction. In that telephone call, Matthews asked the respondent if he was a lawyer, and they discussed the respondent's legal background and his knowledge and relationship with Sposato. The respondent told Matthews that he had known Sposato a long time and had been involved in a number of transactions with him. Matthews confirmed with the respondent that his funds would be transferred to the respondent's trust account. This confirmation together with the respondent's description of his relationship with Sposato provided significant assurance to Matthews to go ahead and invest $120,000.00, the bulk of his life savings, in the transaction. Other than the respondent's testimony, however, no evidence was presented to substantiate the respondent's claim that he had known Sposato for a long time or that he had been involved in other transactions with Sposato. The hearing board determined that the respondent's testimony on these issues was not credible.

At all relevant times, the respondent represented Sposato. When the respondent acted as Sposato's lawyer, he generally reviewed any documents involved in Sposato's business transactions. The significant pertinent documents in this transaction described the respondent as a fiduciary with respect to the receipt and holding of the investment funds.

The records of the respondent's trust account show that $50,000 of Matthews's money was deposited into the respondent's trust account on March 11, 1991, and that on the following day deposits of $50,000 and $20,000 were deposited into the same account. That final deposit of $20,000 was wired to the respondent's trust account through Edward Rumin, a Florida lawyer who assisted Matthews in the wire transfer. When Rumin questioned Matthews about the transaction, Matthews assured him that Matthews was protected because he was sending the money to a lawyer's trust account.

The respondent knew that the money was coming into his trust account and he knew that it was an investment by Matthews in the transaction to buy and sell bank paper. When Matthews's funds were transferred to the trust account, a $7,500 debit memo existed on the respondent's trust account. Matthews's deposits therefore immediately offset the debit memo, and the board found that there was no evidence that the respondent ever repaid the offset.

Within thirty days after Matthews's funds were received in the trust account, the respondent wrote checks depleting the $120,000 until on April 11, 1991, the trust account contained only $510.17. At all relevant times, the only funds in the respondent's trust account came from Matthews. None of the money transferred from the respondent's trust account was used for the business transaction described to Matthews, specifically the purchase of an option. Sposato did not write any of the checks on the respondent's trust account, nor did he have the authority to do so. Moreover, the board found that Matthews never gave Sposato the authority to use the $120,000 for any purpose other than the purchase of an option in the business transaction.

On March 12, 1991, the respondent wrote a trust account check for $52,999.75 to "The Snowbird NA." The respondent testified that he did not recall the purpose of the check, except that it might have been for one of Sposato's debts. This check was written to the same bank where the respondent paid one of his personal loans with a check from his trust account which contained only Matthews's funds.

On March 14, 1991, the respondent wrote thirty checks on his trust account to pay his personal housing bills, condominium dues, credit card charges, telephone bills, car insurance, car payments, and personal loans. The respondent used Matthews's funds to

pay debts that Sposato owed the respondent as well as other personal debts of Sposato. The respondent also paid off a number of his own credit cards that Sposato had been using. These checks totalled $21,901.

The respondent received no authorization from Matthews to disburse Matthews's funds for any purpose other than to transfer the money to a Salt Lake City bank as part of the investment. In addition, Matthews, Krane, and Holmen were not aware that the respondent wrote checks from the trust account to cover the respondent's and Sposato's personal debts.

The respondent testified at the hearing that he disbursed the funds in the trust account at the direction of his client, Sposato. In his deposition from federal prison, Sposato stated that the funds were disbursed pursuant to his directions, and that Matthews will get his money back sometime in the future. Sposato testified that the funds to pay Matthews back are currently tied up as a result of banking difficulties or because of court orders. Sposato was vague about the nature of those matters. Sposato also asserted that he had already purchased the option with his own money before Matthews's funds were wired to the trust account, and that therefore Matthews's funds were his to do with as he pleased. The hearing board noted, however, that no evidence was presented to corroborate or verify the supposed purchase of the option or the commercial paper.

Further, the respondent's children invested $150,000 with Sposato and Sposato claimed that they had made a significant profit. The respondent's children, however, have realized nothing on their investment to date. Sposato described his way of doing business as similar to his concept of a bank. Funds were deposited with him and he had unlimited discretion to use the funds. Sposato claimed that he then returned the funds upon request with the expected profit. At the time of his deposition, Sposato was incarcerated in a federal prison serving a two-year sentence for a felony fraud conviction. The hearing board found that "Sposato's testimony was not credible and was that of the consummate con artist."

After the money was wired to the respondent's trust account, Krane and Holmen made numerous attempts to check on the progress of the transaction and the status of the funds. They were unable to speak with Sposato, but the respondent told them a number of times that there was nothing to worry about and that he would check with Sposato concerning Matthews's funds.

Matthews sent a letter to the respondent dated May 22, 1991, asking the respondent to release and return his $120,000. The respondent never replied to this letter. Matthews hired Edward Rumin, the Florida lawyer, to represent him in obtaining the return of his money. Rumin met with the respondent in the respondent's office in Dillon, and asked for an explanation and for the return of the funds. The respondent told Rumin that he had made a "mistake" in allowing the funds to leave his trust account and that if Rumin would call him later that day, the respondent would speak with Sposato and tell Rumin when Matthews could expect his money back. Rumin was later told that the funds would be available in a few days. The hearing board found Rumin to be a credible witness. The respondent testified at the hearing that by "mistake" he meant getting involved with the individuals and the transaction in the first place and taking their phone calls when they tried to reach Sposato.

Rumin wrote to the respondent on July 30, 1991, asking him to account for Matthews's funds. By a letter dated August 16, 1991, the respondent stated that, according to Sposato, the funds would be sent to Matthews either Wednesday, Thursday, or Friday of that week and that the respondent was no longer holding any funds. The $120,000 has never been returned.

Matthews filed a civil action against Sposato, Sposato's corporation, and the respondent, asserting breach of contract, misappropriation of trust funds, conversion, breach of fiduciary duty, and fraud. The case was settled. In the settlement agreement between Matthews and the respondent, the civil claims were dismissed against the respondent in exchange for an entry of judgment against the respondent in the amount of

$120,000. The respondent was to make payments of at least $1,000 twice a year to Matthews's Colorado lawyer. The respondent's first payment was due on March 1, 1994. No payments have been made. Moreover, the agreement called for the respondent to provide financial statements including tax returns on an annual basis, but the respondent has provided no such documents.

The respondent's deposition was taken in the civil action before it settled. In the deposition, the respondent was asked if he had a conversation in March 1991 with Matthews regarding the transfer of the $120,000 into his trust account. The respondent testified that he did not recall any such conversation until after the wire transfer into his trust account. At the hearing before the board, however, the respondent admitted talking to Matthews on March 8, 1991, before the wire transfer and that the respondent was expecting the money to be transferred to his trust account.

In a letter to the Office of Disciplinary Counsel dated March 31, 1993, the respondent stated that he acted only as Sposato's depository and was not involved in any way except as a trustee for Sposato in the transaction. He did not reveal in the letter his March 8, 1991, telephone conversation with Matthews. By letter dated May 17, 1993, to the Office of Disciplinary Counsel, the respondent asserted that the "funds were transferred at Mr. Sposato's request and were wired at his request on March 12th and March 14th to the places he designated in four different wires." The board found that this statement was contradicted by the bank statements and checks of the respondent's trust account. When questioned about the use of a trust account, the respondent testified that the party depositing the funds authorizes the use of the funds, but he contradicted himself by stating that he had no responsibility to check with Matthews before disbursing the money. The respondent also indicated that he would again engage in business transactions with Sposato after Sposato's release from federal prison.

In conclusion, the board made the following findings:

39. There is clear and convincing evidence that respondent engaged in a number of acts involving dishonesty, fraud, deceit or misrepresentation which resulted in a serious loss to a vulnerable person. His position as an attorney with a trust account provided assurance to an innocent person to become involved in a significant financial investment. Respondent made statements to the victim about his relationship with Sposato which were untrue as shown by respondent's own testimony at this hearing. Respondent then participated in the theft of that investment, to his financial benefit, in violation of his fiduciary duties. Respondent has not repaid any of the victim's loss.

40. Respondent misrepresented to the victim and others involved in the business transaction for a period of at least four months after his misconduct that Matthews' funds were safe, knowing this to be false.

41. Respondent continued his pattern of deceit and misrepresentation during the lawsuit brought against him, during the investigation of this grievance, and through his failure to comply with the terms of the settlement of the lawsuit.

Much of the evidence in this case was hotly contested. "When acting as a fact finder, the hearing board has the duty to assess the credibility of evidence before it, controverted and uncontroverted." *People v. Dieters,* 825 P.2d 478, 481 (Colo.1992). We have examined the record in this case and are satisfied that the hearing board's factual findings are supported by substantial evidence, and are therefore binding on this court. *People v. Shields,* 905 P.2d 608, 611 (Colo.1995). The foregoing conduct violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(6) (a lawyer shall not engage in conduct that adversely reflects on the lawyer's fitness to practice law); and DR 7–102(A)(5) (in representing a client, a lawyer shall not knowingly make a false statement of law or fact); as well as C.R.C.P. 241.6(3) (misconduct involving any act or omission violating the highest standards of

honesty, justice, or morality is grounds for discipline).

## II.

The hearing panel approved the board's recommendation that the respondent be disbarred and, as a condition of readmission, that the respondent satisfy the $120,000 judgment against him. The respondent excepted to the panel's action, claiming that disbarment is too severe a sanction.

Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards* ), in the absence of mitigating factors, disbarment is generally appropriate when "a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." *Id.* at 5.11(b).

As the hearing board noted, the respondent continued to maintain through the grievance process that because he was acting on the instructions of his client, Sposato, he could not have had the scienter necessary for thievery and deception. However,

[u]nder certain circumstances, an attorney's conduct can be so careless or reckless that it must be deemed to be knowing and will constitute a violation of a specific disciplinary rule. *State ex rel. Nebraska State Bar Ass'n. v. Holscher,* 193 Neb. 729, 230 N.W.2d 75, 79 (1975). We believe that the element of scienter is shown with respect to a violation of DR 1–102(A)(4) when it is established that the attorney "deliberately closed his eyes to facts he had a duty to see ... or recklessly stated as facts things of which he was ignorant." *United States v. Benjamin,* 328 F.2d 854, 862 (2d Cir.) (holding that government could meet its burden of proving willfulness in a prosecution for conspiracy to defraud in sale of unregistered securities by showing that defendant auditor had deliberately closed his eyes to facts that were plainly to be seen or recklessly stated as facts things of which he was ignorant), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964).

*People v. Rader,* 822 P.2d 950, 953 (Colo. 1992). The hearing board found that the respondent's conduct was so careless and reckless that, when taken in combination with the fact that he deliberately closed his eyes to facts he had a duty to see, the conduct must be deemed to be knowing and thus sufficient to establish a violation of DR 1–102(A)(4).

The hearing board also determined that certain aggravating factors justified their recommendation of disbarment. First, the respondent had a dishonest or selfish motive, ABA *Standards* 9.22(b), in that he misled the victim about material and relevant facts, withheld pertinent financial information for months following the disbursement of Matthews's funds, benefitted financially from the misconduct, and has not repaid any of the money. Next, the respondent submitted false statements to the Office of Disciplinary Counsel during the investigation of his conduct, *id.* at 9.22(f); and he lied under oath in his deposition in the civil action brought against him. Third, the respondent has at no time acknowledged the wrongful nature of his conduct, even at the hearing before the board, and has never acknowledged Matthews's significant financial loss. *Id.* at 9.22(g). The hearing board also found that Matthews was a vulnerable victim, who lived on a school teacher's pension, was naive about financial matters, and relied upon the respondent's position as a lawyer with a trust account before investing the bulk of his life savings. *Id.* at 9.22(h). Finally, the hearing board determined that the respondent has shown complete indifference to making restitution. Although he agreed to the entry of a judgment against him, he has not complied with even the minimal payment terms or supplied any of the agreed on financial information to Matthews. *Id.* at 9.22(j).

Against these formidable factors in aggravation, the board found that the only mitigating circumstance was the absence of a prior disciplinary record. *Id.* at 9.32(a).

In his exceptions, the respondent contends that discipline less than disbarment is appropriate. Initially, he asserts that disbarment is too severe a sanction given the absence of a prior disciplinary record and given his lack

of experience in the practice of law. The absence of a prior record of discipline, however, has not been considered a substantial mitigating factor in cases involving serious and dishonest misconduct. *See, e.g., People v. Guyerson*, 898 P.2d 1062, 1063–64 (Colo. 1995).

Second, the respondent asserts that the inability to make restitution does not amount to the indifference to paying restitution which gives rise to an aggravating circumstance. The hearing board specifically found that the respondent was indifferent to making restitution, and that finding is supported by the record. The respondent contends that he is financially unable to make even the token payments provided for by the settlement agreement. The respondent's indifference spans a longer period of time than his supposed financial difficulties, however. Further, the respondent has not even supplied the financial information required by the agreement. Under these circumstances, we agree with the hearing board as to the respondent's indifference to making restitution.

Next, in the briefs he has filed in this court, the respondent for the first time alleges that he was in fact deceived by Sposato and was the latter's dupe, as was Matthews. At the hearing, however, even given all of the same information available to the hearing board, the respondent maintained that he would continue to do business with Sposato, once Sposato was released from prison. The respondent also contends that the evidence is at most sufficient to show that he was negligent in allowing Matthews's funds to leave his trust account. The hearing board found otherwise, however, and we have determined above that this finding is supported by substantial evidence in the record. In the same way, the board's conclusion that the respondent was a fiduciary with respect to the transferred funds, based on the various versions of the memorandum of understanding, is supported by the record and we will not disturb it.

Finally, the lawyer disciplinary cases cited by the respondent in which the lawyer was suspended rather than disbarred are not particularly helpful for the purpose of determining the appropriate discipline. The facts in this case are unique.

The respondent's attitude was so cavalier in his dealing with Matthews's life savings when they were in his attorney trust account; his understanding of his fiduciary duty was so corrupted by his own self-interest; his continuing reassurances in the face of the obvious misappropriation of the funds so unreasonable; his misrepresentations in the civil action and to the Office of Disciplinary Counsel so aggravated; and the injury sustained by the victim so great that we have concluded that disbarment is the only appropriate result. We therefore accept the panel's recommendation that the respondent be disbarred.

## III.

It is hereby ordered that William M. Sims, Jr., be disbarred and that his name be stricken from the list of attorneys authorized to practice before this court, effective thirty days after the date on this opinion. No application for readmission will be considered unless the respondent first establishes, by clear and convincing evidence, that he has paid the judgment in the amount of $120,000 to Edgar Matthews. It is further ordered that Sims pay the costs of this proceeding in the amount of $3,330.87 within sixty days of the date of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Dominion Plaza, Denver, Colorado 80202.

ERICKSON, J., does not participate.