The PEOPLE of the State of Colorado, Complainant,

v.

Scott D. McDOWELL, Attorney–Respondent.

No. 96SA300.

Supreme Court of Colorado, En Banc.

July 21, 1997.

Linda Donnelly, Disciplinary Counsel, James C. Coyle, Assistant Disciplinary Counsel, Denver, for Complainant.

Scott D. McDowell, Edgewater, pro se.

PER CURIAM.

A hearing panel of the supreme court grievance committee approved the findings and recommendation of a hearing board that the respondent in this lawyer discipline case be disbarred. The respondent has excepted to the panel's and board's findings and recommendation. We accept the recommendation and order that the respondent be disbarred.

I.

The respondent was licensed to practice law in this state in 1975. He was immediately suspended from the practice of law on September 19, 1996, pending further order of this court. Based on the evidence presented at the hearing, the board made certain findings by clear and convincing evidence. The

facts in this case are complex, and the misconduct charged and discipline recommended are so serious, that the following extended discussion of facts and findings is necessary.

In the winter of 1991–92, Wyatt Bobo of Temecula, California, and Cindy Doumani of Las Vegas, Nevada, contacted persons interested in participating in gambling ventures in the mountain communities of Central City and Black Hawk, Colorado. Limited stakes gaming was introduced in those communities in 1992. Bobo and Doumani operated individually and through business entities known as Amberwood, Inc., Elite Resources, and Oneida Street Corporation (hereinafter collectively referred to as the "Bobo group").

Among the persons contacted were Tim Tarpley, a Denver realtor, and John Hill, a Lakewood businessman. Bobo and Doumani convinced their Colorado contacts that they were wealthy investors with substantial experience in the casino business. Hill introduced the respondent to Bobo and Doumani by telephone. Although he never met Bobo in person, the respondent was impressed with Bobo's claims that he owned a $6 million house, a $6.9 million truck stop, commercial property worth over $23 million, a Ferrari automobile, and an interest in a products liability action worth at least $6 million.

The respondent was hired to perform legal and business services on behalf of the Bobo group, as directed by Bobo. Bobo and Doumani ignored the respondent's efforts to memorialize the business agreement in writing. Nevertheless, the hearing board found that the "respondent was so enticed by the prospect of future wealth that he worked for the Bobo group for months on end without pay." The respondent thought he would be compensated for his legal services at an hourly rate or as otherwise agreed. Of greater significance, however, the respondent "hoped and assumed that he would receive highly lucrative equity interests in the Bobo group's various gaming-related ventures in Colorado."

The respondent therefore considered it to be in his own financial interest to promote and obtain capital for the Bobo group's gaming enterprises. If they succeeded, the respondent believed that he would be wealthy.

"If they failed, for lack of capital or otherwise, the respondent would have lost a once-in-a-lifetime opportunity to get rich from the gaming boom."

The respondent first represented the Bobo group in negotiations involving the purchase of two adjacent lots in Black Hawk known as the Keller property. The Bobo group proposed to build a gaming establishment to be called "Madam Faye's Casino" on the property.

Ernest Lavagetto, a California businessman, advised Bobo that he was interested in investing in the casino. Lavagetto attended a meeting in the respondent's law office in Denver on June 17, 1992. Others present at the meeting were Lavagetto's lawyer and the respondent. Bobo participated by speakerphone.

Lavagetto was persuaded to make a $500,-000 loan toward the Keller transaction, but he required assurances that his money would be safeguarded. The respondent therefore agreed with the others that Lavagetto's funds would be retained in the respondent's trust account. Lavagetto testified that he relied on the respondent's status as a lawyer in believing that his funds would be safe in the trust account. The hearing board found Lavagetto to be a credible witness. In addition, Lavagetto's lawyer drafted a promissory note which provided as follows:

Borrowers agree that all funds shall be deposited into the trust account of Scott McDowell & Associates, Attorney at Law, *and that there shall be no disbursements from such account except as follows:*

1. Approximately $300,000 to be used to perform under contract with Faye Keller to acquire Lots 36 & 37, Millsite, Blackhawk, Colorado (commonly known as Keller property).

2. Approximately $55,000 to be paid to Blackhawk, Colorado for water and sewer taps. *There shall be no other disbursements from such account without the express written consent of Lender* [.]

(Emphasis added.) The note also provided that:

Upon written demand of Lender, all principal shall be due and payable as follows: 1. $140,000 immediately upon written demand, payable out of Scott McDowell & Associates, Attorney at Law trust account. 2. $360,000 within thirty (30) days of written demand.

The "Lender" in the note was the Earnest Group, Inc., Lavagetto's wholly-owned corporation. The $360,000 corresponded roughly to the amount that Lavagetto authorized the respondent to disburse for acquisition of the Keller property and for the purchase of water and sewer taps. The $140,000 that was payable immediately upon written demand was the remaining amount that Lavagetto had prohibited the respondent from disbursing without express written consent.

The hearing board determined that the respondent reviewed the promissory note at the June 17 meeting and was aware of its terms. Lavagetto's lawyer, whom the board found to be a credible witness, testified that the respondent orally acknowledged a responsibility to disburse Lavagetto's funds from the trust account according to the note's terms. Moreover, the respondent prepared and signed the following letter addressed to Lavagetto and dated June 17, 1992:

Dear Mr. Lavagetto:

This is to acknowledge the receipt of $500,-000.00 in certified funds this date in accordance with a Promissory Note from Oneida St. Corp., a copy of which is attached hereto. *This is to confirm that I will disburse such funds only as directed by said Promissory Note.*

(Emphasis added.) Notwithstanding this, the respondent testified at the hearing that he had "problems" with the promissory note because he felt that some of the provisions were unclear. At first, the respondent testified that he interpreted the note to mean that the approximately $140,000 or $145,000 not specifically committed to the acquisition of the Keller property and the water and sewer taps was the Bobo group's to use entirely as the Bobo group saw fit. He also stated that he interpreted the promissory note as a 30–day note for $360,000 which entitled the Bobo group to use $360,000 of the funds at the group's discretion, provided the funds were returned within thirty days of Lavagetto's demand.

The hearing board found the respondent's testimony regarding his interpretation of the promissory note "to be incredible and unbelievable."

When acting as a fact finder, the hearing board has the duty to "assess the credibility of evidence before it, controverted and uncontroverted." *People v. Dieters*, 825 P.2d 478, 481 (Colo.1992). We have examined the record in this case and are satisfied that the hearing board's factual findings are supported by substantial evidence, and are therefore binding on this court. *People v. Shields*, 905 P.2d 608, 611 (Colo. 1995).

*People v. Sims*, 913 P.2d 526, 529 (Colo.1996). As the board noted, the respondent later changed his story to indicate that it was only Bobo who interpreted the note in the above fashion and that the respondent himself disagreed with Bobo, personally understanding the note to require the express written consent of the Lender for any disbursements other than the approximately $360,000 permitted by the note. In addition, the respondent never disclosed any uncertainties or reservations he may have had about the note's terms to Lavagetto or Lavagetto's lawyer.

The hearing board concluded that the terms of the note were in fact clear and unambiguous and

that the respondent knew that any disbursements of Lavagetto's money, other than the disbursements specifically authorized by the note, required the express written consent of the lender. In acting contrary to the requirements of the note, the respondent either intentionally violated his fiduciary obligations under the note, or, at a bare minimum, was so reckless and "deliberately closed his eyes to facts he had a duty to see" that he knowingly violated his obligations. *People v. Sims*, 913 P.2d 526, 530 (Colo.1996).

Immediately prior to the deposit of the $500,-000 into the respondent's trust account on June 17, 1992, the account had a balance of $953.06. On June 17, the respondent dis-

bursed $52,300 to pay for the water and sewer taps and $75,000 as an earnest money deposit on the Keller property. Both of these disbursements were authorized by the note.

However, the next day the respondent used $50,000 from his trust account to pay for a purchase option on the Parfenoff property, an entirely different Black Hawk parcel of property sought by the Bobo group. As legal counsel for the Bobo group, the respondent thought that he possessed a potentially lucrative equity interest. So, he believed that he could gain personally from his disbursement of $50,000 for the Parfenoff option.

The respondent testified that the $50,000 transfer was made at the urging of an individual he believed to be Lavagetto's partner, Tim Tarpley, although his reasons for thinking so were vague and inconsistent. Lavagetto and his lawyer denied that this other individual was a partner or agent of Lavagetto or the Earnest Group. The hearing board was not able to conclude by clear and convincing evidence, however, that this individual was not technically Lavagetto's agent with respect to the Parfenoff property. Nevertheless, the respondent knew that his disbursement of $50,000 was neither directed or authorized by the note or by his letter to Lavagetto. At no time did the respondent make even the minimal effort required to obtain written confirmation for the disbursement for the Parfenoff option. Nor did the respondent ever provide Lavagetto with any notice of this $50,000 disbursement. Had he been asked, Lavagetto would have refused to permit the $50,000 to be used for the Parfenoff option. The board therefore found that the respondent intentionally, or at least knowingly, violated his fiduciary obligations with respect to the funds in his trust account.

On June 19, 1992, the Bobo group entity called Amberwood, Inc., entered into a loan agreement with B and B Minnesota Partners (B & B), an organization represented by Minnesota lawyer Alan Eidsness. Pursuant to a loan agreement and accompanying promissory note, B & B lent the Bobo group $2 million to develop two other Black Hawk properties: "Dolly's Casino" and a proposed

parking lot referred to as the "Coyote Inn." The respondent told Eidsness that he needed the funds as soon as possible, so Eidsness and the respondent agreed to place B & B's money in the respondent's trust account. Eidsness, whom the hearing board found to be a credible witness, testified that he relied upon the respondent's status as a lawyer in agreeing to place the funds in the respondent's trust account rather than in a special bank account.

On June 22, 1992, before receiving any of the B & B funds, the respondent disbursed $300,000 from his trust account to pay for the Coyote Inn parking lot. Virtually all of the funds in the trust account at that time were from Lavagetto, and the respondent's disbursal for the parking lot was not authorized, and Lavagetto would have refused permission had he been notified or asked. The $2 million from B & B was deposited into the respondent's trust account on June 23, 1992. The same day, Eidsness wrote a letter to the respondent to confirm that the money was to be held in the respondent's trust account and was to be disbursed as follows: (1) $500,000 toward the purchase of the Coyote Inn parking lot; and (2) $1,500,000 for the continuation of construction and the acquisition of the assets of Dolly's Inn. The respondent did not question these terms.

The same day, the respondent sent Lavagetto's lawyer a letter enclosing the original promissory note. The respondent did not disclose that he had already disbursed $350,000 contrary to the terms of the promissory note and to the respondent's letter to Lavagetto. On June 24, the respondent properly disbursed $30,000 from his trust account as a further earnest money deposit on the Keller property.

As of late June 1992, the respondent had been working for the Bobo group for many weeks without pay. When he informed Bobo that he needed at least some reimbursement at that point, Bobo told the respondent to pay himself from the funds in his trust account. The respondent was apparently not alarmed that a self-professed multi-millionaire like Bobo would not pay his legal fees. He then paid himself $30,000 from his trust account for the attorney fees owed by the

Bobo group. When he transferred the $30,-000 from his trust account to his operating account, nearly all funds in the trust account were those deposited by Lavagetto and B & B.

The respondent testified that he had "no hesitancy" in transferring the funds because Bobo told him to do so. The hearing board found this part of the respondent's testimony "unbelievable." The hearing board determined that the respondent intentionally, or at least knowingly, violated his fiduciary duty with respect to the funds in his trust account when he paid himself $30,000 from those funds.

On June 24, 1992, the respondent wired $500,000 from his trust account to a bank account controlled by Bobo. He testified that this amount was intended to be used to purchase lumber and other casino construction materials. Robert Galliano, an associate of Bobo's, testified that the $500,000 was to fund construction of "some of the [Bobo group] projects" underway in Colorado. The respondent understood that $300,000 of the $500,000 was from Lavagetto and $200,000 was from B & B. Documentation for this major transfer was minimal or nonexistent. "The respondent simply gave Bobo half a million dollars of Lavagetto's and B & B's funds without indicating who was buying what, and without preparing so much as a receipt." The hearing board found the respondent's testimony at the hearing that the transfer was in fact authorized under the promissory note to be incredible. The respondent's position was that the $300,000 transfer for construction materials was authorized under the provision in the promissory note that stated, "Approximately $300,000 to be used to perform under contract with Faye Keller to acquire Lots 36 & 37, Millsite, Blackhawk, Colorado." The $300,000 was not going to be used to "acquire" the property (acquisition was beset with serious title problems), and the respondent had already disbursed $105,000 of the $300,000 authorized for acquisition as earnest money, leaving only $195,000 for the Keller property. On the other hand, the hearing board could not determine by clear and convincing evidence that the transfer of $200,000 of the funds

deposited by B & B was not authorized. In any event, the board concluded that the respondent intentionally or knowingly violated his fiduciary duty with respect to the Lavagetto funds in his trust account by making this $500,000 transfer to Bobo.

The Keller property purchase was called off at least temporarily on June 25, 1992 because of problems in the title, and the $105,000 earnest money was redeposited in the respondent's trust account. The respondent sent Lavagetto's lawyer a letter on the same day promising to keep him posted on the Keller contract, but did not tell him that he had already disbursed Lavagetto's funds for purposes that were not authorized. The respondent testified that he "wanted" to disclose these disbursements, but that he was instructed by Bobo not to do so. The respondent also testified that since Bobo was his client, he was ethically obligated to do what Bobo directed him to do, and that he was not at fault for withholding this information from Lavagetto because Lavagetto was not his client. The hearing board found "this testimony by the respondent to be unworthy of belief. The respondent intentionally concealed the above information from Lavagetto and [Lavagetto's lawyer]."

The next day, Lavagetto's lawyer sent the following letter by facsimile transmission:

> Ernie Lavagetto is interested in pursuing the formation of an entity to develop a casino at the subject property. However, until such time as an acceptable real estate contract and operating agreement or partnership agreement can be negotiated, he is not willing to keep his funds at risk. Accordingly, you are directed that there should be no further disbursements from your trust account of the funds advanced by Ernie Lavagetto. This would include delivery of either the $30,000 or $75,000 cashier's check. Please immediately deliver a check made payable to our firm's trust account in the amount of $447,700 ($500,-000 less $52,300). We will arrange with Tim Tarpley to obtain a refund of the tap fee paid to Black Hawk.

Although he testified that he believed the demand for immediate reimbursement of the $447,700 was invalid under the terms of the

note, the respondent did not communicate this to Lavagetto's lawyer, nor did he reveal that he had already made other disbursements of the funds for other purposes. Instead, the respondent replied as follows by facsimile transmission: "I have FAX'd a copy of your letter to Wyatt Bobo. I need his approval before I can release any funds. I will contact you as soon as I hear from Wyatt." The promissory note contained no requirement for Bobo's approval as a condition for the respondent's release of the Lavagetto funds.

Also on June 26, the respondent learned that the financial guarantee for the Dolly's Inn and Coyote Inn transaction was fraudulent, as did Eidsness. The respondent told Eidsness when Eidsness called that he had disbursed $500,000 to pay for the parking lot and $200,000 for casino construction. Eidsness told the respondent that the $200,000 disbursement was unauthorized and Eidsness testified that the respondent admitted as much. The respondent denied making this admission. On June 26, the respondent transferred back to B & B the $1.3 million which remained of B & B's funds.

On June 29, 1992, a facsimile transmission was sent to Lavagetto's lawyer at the respondent's direction offering Lavagetto a 25% interest in a limited liability company which would continue to attempt to purchase the Keller property, but, "in the event that the property is not acquired, then Mr. Lavagetto will be entitled to the return of his funds pursuant to the promissory note previously executed by the parties." While the respondent saw nothing "in any way improper for him to hold Lavagetto's entrusted funds hostage while pressuring Lavagetto to engage in further speculative ventures with the Bobo group and the respondent," the board concluded that the June 29 proposal was yet another intentional or knowing attempt on the respondent's part to conceal the true state of affairs regarding the funds he held in trust. In response, Lavagetto's lawyer stated that it was

> unacceptable with respect to the return of Mr. Lavagetto's funds. To reiterate our demand of Friday, all of the funds, except for the amount paid to Black Hawk for

water taps, should be immediately returned. Per the specific terms of the promissory note, $140,000 is due immediately upon written demand. This amount is payable out of your trust account.

> With respect to the balance of the funds, you are hereby directed not to disburse any funds with respect to the Keller property.... A disbursement from your account contrary to these instructions will be considered a very serious breach of the understanding within which the funds were deposited into your account.

> At the very least, you should consider this letter an immediate demand for a return of $140,000, and a 30–day demand for the return of the balance of the funds.

Lavagetto also sent a memorandum on June 30, 1992 directly to Bobo, requesting Bobo to instruct the respondent to return Lavagetto's funds. On June 30, Bobo wired $140,000 to the respondent's trust account.

The next day, the respondent disbursed $200,000 to B & B, the balance of the funds to which B & B was legally entitled, since the $500,000 payment for the parking lot had been authorized. Lavagetto has not been so fortunate.

The parties stipulated that of the $500,000 deposited into the respondent's trust account by Lavagetto, only $52,300 has been returned. The remaining $447,700 was either retained or disbursed improperly by the respondent: (1) $360,000 ($500,000 less $140,000) was transferred to Bobo; (2) the respondent took $30,000 as attorney fees; and (3) $50,000 was spent on the unauthorized Parfenoff option. The $7,700 which theoretically remained has not been returned to Lavagetto.

The respondent did not comply with numerous requests for an accounting and return of funds throughout July 1992. The board found that the respondent's failure to respond to Lavagetto's July 9 demand for an accounting and return of funds was an intentional or knowing attempt to conceal the true state of affairs from Lavagetto. In addition, as of July 31, 1992, the respondent still had not disclosed that he had paid himself $30,000 from the funds or that he had used

$50,000 of the Lavagetto funds to pay for the Parfenoff option.

On August 7, 1992, Lavagetto filed an action against the respondent and others. The respondent eventually entered into a settlement agreement, which apparently provided that the respondent was to pay Lavagetto $79,000 in monthly installments of $3,000. This settlement agreement was not voluntary, but rather forced or compelled, and therefore not a mitigating factor. *See People v. Finesilver*, 826 P.2d 1256, 1258–59 (Colo. 1992); ABA *Standards for Imposing Lawyer Sanctions* 9.4(a) (1986 & Supp.1992) (ABA *Standards*). Further, the respondent has defaulted on his obligations under the settlement agreement and has paid only $4,000 thereon before discontinuing payments entirely. At the hearing the respondent claimed that his good faith in attempting to make restitution was demonstrated by his not filing for bankruptcy. The hearing board nevertheless concluded that the respondent has been indifferent to making restitution. *See* ABA *Standards* 9.22(j) (indifference to making restitution is an aggravating factor for analyzing the appropriate disciplinary sanction).

The hearing board determined that Lavagetto and the Earnest Group suffered substantial harm as a result of the respondent's mishandling of his trust account. The hearing board noted that "[a]t the hearing the respondent exhibited virtually no remorse concerning his actions. To the contrary, the respondent complained that it seemed unfair to him that of all the persons misled by Bobo, only he was being charged with misconduct. As the respondent stated: 'Everyone else was duped but me.'" *Compare* ABA *Standards* 9.22(g) (refusal to acknowledge wrongful nature of conduct is an aggravating factor) *with id.* at (*l*) (presence of remorse is a mitigating factor).

The hearing board found that the respondent violated the following disciplinary rules. In disbursing the $50,000 for the Parfenoff option, taking $30,000 for his own purposes, transferring $300,000 of Lavagetto's funds to Bobo, and in attempting to conceal these transactions from Lavagetto, the respondent violated DR 1–102(A)(4) (engaging in conduct

involving dishonesty, fraud, deceit, or misrepresentation); and DR 1–102(A)(6) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law). In addition, as the hearing board determined, the respondent's mishandling of the funds he held in trust amounted to a knowing conversion of those funds.

II.

The hearing panel approved the hearing board's recommendation that the respondent be disbarred, with readmission conditioned on paying the entire judgment owed to Lavagetto. The respondent has excepted to that recommendation. Under the ABA *Standards*, in the absence of mitigating factors, disbarment is generally appropriate when "a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." *Id.* at 5.11(b). Disbarment is the presumed sanction in a case such as this:

> We have repeatedly held that a lawyer's knowing misappropriation of funds, whether belonging to a client or third party, warrants disbarment except in the presence of extraordinary factors of mitigation. *See, e.g., People v. Mundis*, 929 P.2d 1327, 1331 (Colo.1996) (lawyer disbarred for knowing misappropriation of client funds, neglect of client matters, and practicing law under suspension); *People v. Motsenbocker*, 926 P.2d 576, 577 (Colo.1996) (lawyer disbarred for knowingly misappropriating bar association funds); see also ABA *Standards* 4.11 (in the absence of mitigating factors, "[d]isbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.").

*People v. Lavenhar*, 934 P.2d 1355, 1359 (Colo.1997). The respondent nonetheless asserts that disbarment is not appropriate.

The respondent begins by taking the position that he "tried to do what was right by his clients, to zealously represent his clients—and only his clients—without confusing the issue by attempting to provide legal advice and counsel to others, especially oth-

ers who were represented by counsel." By his clients, the respondent of course means Bobo and the Bobo group. This argument completely misses the point, which is that the respondent knowingly misappropriated the funds in his trust account.

The respondent also blames his current ethical problems on a "lesson" he supposedly learned in 1986. In *People v. McDowell*, 718 P.2d 541, 544–46 (Colo.1986), we suspended this same respondent for six months for simultaneously representing both the seller and the purchaser in the sale of a corporate business, for handling the matter with inadequate preparation, and for withholding highly material information from the purchaser. The respondent now complains that

> [t]o now punish and penalize Respondent by the most severe penalty available for doing exactly what he had been told to do in 1986, and what he understands the ethics requirements of zealous representation of his client to be, is patently unfair and completely inconsistent with the lesson taught to Respondent in 1986.

The respondent's suggestion that he would have had to simultaneously represent Bobo, Lavagetto, and B & B to avoid his current problem is without merit. The respondent has again engaged in conduct involving dishonesty, fraud deceit, or misrepresentation in violation of DR 1–102(A)(4). *See McDowell*, 718 P.2d at 546 (knowingly withholding highly relevant information from one party to a transaction violated DR 1–102(A)(4)).

■ The respondent alleges that his actions concerning the trust funds were in the course of "doing what was right by his clients." This explanation hardly justifies disbursing funds in the lawyer's trust account in violation of the directions contained in the promissory note and acknowledged in the lawyer's confirmatory letter. "Mitigation should not include a lawyer's claim that 'the client made me do it.' Each lawyer is responsible for adhering to the ethical standards of the profession. Unethical conduct is much less likely to be deterred if lawyers can lessen or avoid the imposition of sanctions merely by blaming the client." ABA *Standards* 9.4 commentary.

The respondent maintains that directions in the note were ambiguous, but the hearing board found them to be unambiguous. We agree with the hearing board. Whatever hypothetical ambiguities might have existed in the promissory note's directions, they do not even arguably excuse the disbursement of significant amounts of funds directly contrary to the terms of the note.

■ The respondent also reiterates his belief that Tarpley was Lavagetto's agent. Whether Tarpley was in fact Lavagetto's agent was left unresolved by the hearing board and did not affect the recommendation. Other concerns raised by the respondent involve the interpretation of the promissory note and how a proper demand for repayment was to be made, and whether the respondent made certain misrepresentations to Lavagetto's lawyer concerning the status and location of the funds. These issues were resolved against the respondent by the hearing board. The board's findings in this regard are supported by substantial evidence, and are therefore binding on the court. *People v. Sims*, 913 P.2d 526, 529 (Colo.1996).

■ The respondent also claims that his actions "were clearly not intentional or knowing conversion, fraud, deceit or misrepresentation, which is the standard that must be applied for disbarment." The facts in this case are similar to those present in *Sims*, 913 P.2d 526. The lawyer in *Sims*, whom we disbarred, asserted that he could not have knowingly misappropriated funds he held in his trust account for third parties because he was only acting on the instructions of his client, Sposato. *Id.* at 530. We rejected that argument because

> "[u]nder certain circumstances, an attorney's conduct can be so careless or reckless that it must be deemed to be knowing and will constitute a violation of a specific disciplinary rule." *State ex rel. Nebraska State Bar Ass'n. v. Holscher*, 193 Neb. 729, 230 N.W.2d 75, 79 (1975). We believe that the element of scienter is shown with respect to a violation of DR 1–102(A)(4) when it is established that the attorney "deliberately closed his eyes to facts he had a duty to see ... or recklessly stated as facts things of which he was ignorant."

*United States v. Benjamin*, 328 F.2d 854, 862 (2d Cir.) (holding that government could meet its burden of proving willfulness in a prosecution for conspiracy to defraud in sale of unregistered securities by showing that defendant auditor had deliberately closed his eyes to facts that were plainly to be seen or recklessly stated as facts things of which he was ignorant), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964).

*Sims*, 913 P.2d at 530 (quoting *People v. Rader*, 822 P.2d 950, 953 (Colo.1992)). We agree with the hearing board in this case that the respondent's actions were comparably dishonest and corrupted by self-interest.

■ The hearing board found the presence of the following factors in aggravation: the respondent has a significant record of prior discipline, including a letter of admonition in 1979 and a six-month suspension in 1986, *see McDowell*, 718 P.2d at 546; *see also* ABA *Standards* 9.22(a); the respondent had a dishonest or selfish motive, *see id.* at 9.22(b); there is a pattern of misconduct, *see id.* at 9.22(c); multiple offenses, *see id.* at 9.22(d); the respondent has refused to acknowledge the wrongful nature of his conduct as the briefs filed in this court so amply demonstrate, *see id.* at 9.22(g); the respondent has substantial experience in the practice of law, *see id.* at 9.22(i); and he has been indifferent to making restitution, *see id.* at 9.22(j).[1]

The only mitigating factor found was that the respondent has cooperated in these proceedings, *see id.* at 9.32(e), and, as the board stated, has "fully cooperated in criminal investigations of Wyatt Bobo, was a key witness in the criminal case against Bobo, and gave consistent, truthful information to the investigators."

We agree with the hearing board that disbarment is appropriate in this case. The respondent's purported inability to comprehend the wrongfulness of his conduct, and how his ethical obligations were perverted by his greed, is a vivid additional demonstration of the danger the respondent would present to the public if allowed to continue to practice law. We therefore accept the recommendation that the respondent be disbarred.

### III.

It is hereby ordered that Scott D. McDowell be disbarred and that his name be stricken from the list of attorneys authorized to practice before this court, effective immediately. It is also ordered that, prior to any application for readmission and as a condition thereof, the respondent must establish by clear and convincing evidence that he has paid the entire judgment owed to or on behalf of Ernest Lavagetto. It is further ordered that the respondent pay the costs of this proceeding in the amount of $2,573.29 within ninety days of the date of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202.

BENDER, J., does not participate.

---

1. The respondent challenges the finding that he has been indifferent to making restitution, and as evidence cites the fact that he has not filed for bankruptcy. The board's finding of indifference to restitution finds support in the record and we will not overturn it.