The PEOPLE of the State of Colorado, Complainant,

v.

David L. JACKSON, Attorney–Respondent.

No. 96SA435.

Supreme Court of Colorado, En Banc.

Aug. 18, 1997.

Linda Donnelly, Disciplinary Counsel, Kenneth B. Pennywell, Assistant Disciplinary Counsel, Denver, for Complainant.

Scot M. Peterson, Michael H. Berger, Denver, for Attorney–Respondent.

PER CURIAM.

This is a lawyer discipline case. A hearing panel of the supreme court grievance committee approved the findings and recommendation of a hearing board that the respondent be suspended from the practice of law for three years and be required to make certain restitution as a condition for reinstatement. We issued an order to show cause why more severe discipline should not be imposed. After considering the responses of the parties to the order to show cause, we have concluded that the respondent's conduct reflects so seriously and adversely on his fitness to practice law that he should be disbarred.

I.

The respondent was admitted to the practice of law in this state in 1972. The hearing board listened to the testimony of the complainant's and respondent's witnesses, including the respondent himself, and considered the exhibits introduced into evidence. Following the hearing, the board found that the following had been established by clear and convincing evidence.

Two fraudulent real estate transactions took place in 1988, one concerning the respondent's residence, the other the residence of the respondent's brother, William Jackson. The events leading up to the transactions began in 1984 when four individuals, Chris Lopez, John O'Neill, Augie Lopez, and Garry Kispert, became associated with real estate development in Arizona. Chris Lopez was in charge of sales for the development. O'Neill's title was project coordinator and Augie Lopez (no relation to Chris Lopez) was in charge of construction. Kispert handled all of the insurance matters for the development.

The respondent's role with the Arizona development began in early 1988. He formed a corporation, Inter–West Builders of America, which was to be the legal entity responsible for the development. William Jackson was the majority owner of the corporation's stock, and Chris Lopez, Garry Kispert, John O'Neill, and Augie Lopez also owned stock. The respondent did not invest in the Arizona project, although he agreed to perform legal work for the corporation based on the understanding that if the development proved successful, he would receive compensation for his legal work in the form of stock in the corporation.

Early in 1988, the respondent's brother expressed a desire to sell his house in Colorado and move to California. The respondent and his brother lived in separate houses on Upper Bear Creek Road in Evergreen. O'Neill wanted to buy William Jackson's house. The respondent acted as his brother's lawyer in the sale of the house.

The respondent knew that O'Neill had limited financial resources and suspected that O'Neill could not qualify for a loan to buy his

brother's house, which was worth about $490,000. In order for the sale to take place, therefore, William Jackson and John O'Neill arranged for a "straw man" to pretend to be the purchaser on paper, while O'Neill would be the purchaser in fact. Kispert, who had a good credit rating, agreed to be the straw man and fill the role of the purported purchaser. His part in the scheme was to submit a loan application based on his credit in order to obtain financing for the purchase of the house. The financing arrangement required the buyer to put a 20% down payment on the purchase. On June 17, 1988, Kispert signed a contract to buy the house from the respondent's brother for a purchase price of $495,000, with a down payment of $123,750.[1]

Garry Kispert had previously submitted a fraudulent loan application to Pacific First Mortgage Corporation on June 13. The application contained an inflated estimate of Kispert's monthly income and was part of the scheme to induce Pacific First to loan a total of $366,272.16 toward the purchase of William Jackson's home. Pacific First was not aware that Kispert had no intention whatsoever of purchasing or living in the house. The hearing board concluded, however, that it had not been proven by clear and convincing evidence that the respondent was involved in the preparation or submission of Kispert's loan application, or that he knew that the application contained false information.

Pacific First assumed that Kispert was the actual purchaser, that he intended to live in the house, and that he would fund the down payment. Kispert actually provided nothing for the down payment. Before the closing, the respondent prepared and had Kispert sign a promissory note and deed of trust in the amount of $125,000 payable to William R. Jackson. Kispert received nothing in consideration of signing the promissory note. The property that was pledged as collateral in the deed of trust was the respondent's brother's residence. Since the note and deed of trust were executed before closing, Kispert had no legal interest in the property pledged.

The respondent took the note and deed of trust to a business associate who exchanged it for a check in the amount of $125,000 drawn on the associate's company, Western National Mortgage Company. The check was made payable to "David L. Jackson Law Trust Account." The respondent used these funds for the down payment at the closing.

The closing took place on June 29, 1988. Pacific First provided a check for $366,272.16 at the closing representing the loan it was making to Kispert. The down payment of $120,627.16 was provided by the respondent in the form of a check drawn on his trust account. After paying off the existing mortgage, William Jackson received net proceeds of $326,475.07 as a check payable to him. The respondent deposited this check in his trust account immediately after closing. The respondent then wrote a check on his trust account in the amount of $125,000 to Western National to repay the loan for the down payment. He also paid Western National a fee of $1,500 for the short term use of the money.

Although the respondent claims that he was told that Pacific First did not care where the money for the down payment came from, the hearing board did not find his testimony credible. Rather, the board found that the respondent participated in a scheme to conceal the source of the down payment from the lender; and that if Pacific First had known the true source of the down payment, it would not have made the loan.

In the pursuit of the loan proceeds for the purchase of his brother's house, the respondent wrote a false and misleading letter to Pacific First's loan officer on June 17, 1988:

> This letter is to and does acknowledge that concerning the above-referenced agreement for sale of real property, the undersigned holds in escrow the deposit for the difference between the selling price and the amount to be financed, which difference is not to exceed $125,000.00. I will bring the same to closing for the endorse-

---

**1.** Although the hearing board states that a selling price of $495,000 would require a down payment of approximately $123,750, this is actually 25% of the purchase price. Nothing in the case turns on this apparent discrepancy, however.

ment of Garry Kispert to William R. Jackson.

When he wrote the letter, the respondent had no funds for the down payment, only the promissory note signed by Kispert. Pacific First relied on this misleading letter in proceeding to close on the loan.

The respondent's brother signed a statement at the closing certifying that "no fees, charges or discounts have been received, paid or collected, nor will be in the future, directly or indirectly, to any party to this transaction, including the buyer, that have not been disclosed to" Pacific First. The board found that, as his brother's lawyer, the respondent should have reviewed this statement and advised his brother not to sign it because it was not correct. The statement concealed the means by which the down payment was obtained and the fees paid to Western Mortgage for the short term use of the down payment funds. In addition, William Jackson and Garry Kispert signed an affidavit at the closing stating that Kispert would occupy the property as his principal residence. The respondent should have advised his brother not to sign this affidavit. Pacific First would not have made the loan if it had known that Kispert did not intend to live in the house.

After the closing, John O'Neill moved into the house. Neither Garry Kispert, the fictitious purchaser, nor John O'Neill, the intended purchaser, ever made any payments to Pacific First. Instead, the respondent made the first five monthly payments out of his trust account from the proceeds his brother received from Pacific First at the closing. When the respondent stopped making these payments, the loan went into default, and Pacific First foreclosed on the property. The hearing board determined that the total loss sustained by Pacific First on the loans it made for the purchase of the respondent's brother's home and the respondent's home (see below) was about $500,000.

The sale of the respondent's home took place several months after the sale of his brother's home, and in much the same way. A fictitious purchaser was chosen solely for her good credit record and consequent ability to attract financing for the purchase of the home by the real buyer, who was in no position to qualify for the loan. This time, the real purchaser was Chris Lopez who was making about $1,500 a month, had no savings, and lived with his parents. The purported purchaser was Ellen Pence. Pence's husband, Ernie Swinden, was acquainted with those participating in the Arizona development and played a small role as a real estate agent for the development.

Swinden pressured his wife to act as the apparent purchaser of the respondent's home. She received a fee of $3,000 from the respondent to allow her name and good credit history to be used. The hearing board found that Pence was unsophisticated in business matters, was unaware of the fraudulent aspects of the transaction, and became an innocent victim of the scheme herself.

In any event, the respondent and Pence entered into a contract for the sale of his residence for $560,000. On August 24, 1988, Pence signed a loan application to Pacific First asking for a loan of $464,000 to buy the house. The application represented that Pence's monthly income was $12,500 when in fact it was $2,500. The hearing board determined, however, that neither Pence nor the respondent knew that the wrong monthly income figure was inserted in the application. Pacific First required a 20% down payment. The hearing board states that the down payment was approximately $119,000. To obtain the money for the down payment, the respondent prepared a promissory note in the amount of $125,000 for Chris Lopez to execute in favor of the respondent. The note was secured by a deed of trust in the respondent's home, in which Lopez had no legal interest when he signed the deed of trust. Lopez received nothing for signing the note. The respondent then took the note to Western National and obtained a short term loan for the down payment.

Pacific First required written proof before closing of the availability of the down payment, as in the first transaction. Since he was the seller this time, the respondent arranged for a business colleague to sign a letter the respondent drafted and sent to the lender's loan officer, which stated:

This is to advise you that the "Investment Account—Ellen Pence" holds proceeds of One Hundred Fifty Thousand Dollars ($150,000.00) from which the $119,000.00 down payment amount will be paid on the Ellen Pence and David L. and Patricia Jackson contract ... dated August 18, 1988. Since the closing costs are to be paid by the sellers (Jackson) the $119,-000.00 is the amount which will be brought to closing.

The letter was signed by Don Bartlett on behalf of Union/West Development Co., which was a real estate corporation owned in part by the respondent. It was not an investment company. It had no investment accounts, much less a genuine investment account in the name of Ellen Pence, all of which the respondent knew when he wrote the letter. What Union/West did have was a file folder marked "Investment Account—Ellen Pence" which contained the Chris Lopez promissory note. The respondent prepared this false and misleading letter for Bartlett's signature to deceive Pacific First into believing that Ellen Pence had an investment account at Union/West containing $150,000.

The closing took place on September 16, 1988. Pacific First provided a loan in the amount of $448,000 and took a deed of trust and note from Ellen Pence. After paying off the existing mortgage, the respondent received net proceeds of $181,084.11. He then paid back the short term loan of the down payment funds to Western Mortgage, including a $1,500 fee for the use of the funds. At the closing, the respondent signed a statement certifying that "no fees, charges or discounts have been received, paid or collected, nor will be in the future, directly or indirectly, to any party to this transaction, including the buyer, that have not been disclosed to" Pacific First. The statement was false because it concealed the manner in which the down payment was obtained and the fees that had been paid to both Western Mortgage and Ellen Pence.

Chris Lopez moved into the respondent's house after the closing. For the first few months, the respondent made the mortgage payments to Pacific First out of his trust account. Neither Chris Lopez nor Ellen Pence ever made any mortgage payments. The respondent stopped making the mortgage payments, Pacific First foreclosed on the property and sold it, sustaining a substantial financial loss.

The hearing board found that the real purpose underlying the sales of the respondent's and his brother's homes was to generate cash to get the Arizona project off of the ground. The respondent stood to gain if that happened because he would have received stock in the development corporation. The only way that the two Pacific First mortgages could be paid, that Chris Lopez could repay the respondent money the respondent loaned him, and that John O'Neill could repay the respondent's brother, was for the Arizona project to generate substantial profits.

The respondent's and the other participants' expectations were unfounded. By the beginning of 1989, the Arizona development was an obvious failure. The savings and loan that had agreed to provide financing collapsed.

Pacific First obtained a default judgment against Chris Lopez in the amount of $577,-827. Nothing was paid on this judgment and Lopez received a discharge in bankruptcy in 1996.

Pacific First brought an action in the District Court for the City and County of Denver against persons involved in these two transactions: Garry Kispert, Ellen Pence, William Jackson, and the respondent. Kispert settled for $50,000 which was paid in a lump sum. Pence also settled for $50,000, which she is paying off in monthly installments of $425. Although the respondent's brother filed for bankruptcy, his debt to Pacific First was declared nondischargeable because of fraud. Nevertheless, Pacific First has not been able to collect on its judgment against William Jackson.

The respondent filed a petition in bankruptcy in February 1992, and he received a discharge on May 29, 1992. Pacific First's objection that it had not received notice of the bankruptcy was overruled. The only amount that Pacific First has been able to

recover, therefore, is Kispert's $50,000 and Pence's monthly payments which will eventually total $50,000. Neither the respondent nor his brother have paid anything to Pacific First beyond the monthly mortgage payments mentioned above.

The hearing board concluded that the respondent's conduct in selling his residence and participating in the sale of his brother's house violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and DR 7–102(A)(5) (in representing a client, a lawyer shall not knowingly make a false statement of law or fact). In addition, because he commingled personal funds with client funds in his trust account, the respondent violated DR 9–102(A).

## II.

The hearing panel approved the board's recommendation that the respondent be suspended from the practice of law for three years and be required to make restitution to Ellen Pence as a condition of reinstatement. The respondent excepted to the requirement of restitution. We issued an order to show cause why more severe discipline should not be imposed. In his response to the order to show cause, the assistant disciplinary counsel now takes the position that disbarment is appropriate. We agree that our caselaw and the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards*) support disbarment in this case.

ABA *Standards* 5.11 provides that, in the absence of mitigating circumstances, disbarment is appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes ... misrepresentation, fraud, extortion, misappropriation, or theft; ... or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

ABA *Standards* 5.11. In *People v. Hilgendorf*, 895 P.2d 544, 544 (Colo.1995), the lawyer was convicted of two counts of violating 18 U.S.C. § 1014 (1988) (knowingly making

false statements or willfully overvaluing property with the purpose of influencing the action of a federal bank).

One of the convictions resulted from the respondent's willful overvaluation of certain parcels of land and his knowing failure to list numerous debts to other banks in connection with his efforts to obtain an extension on the maturity date of a loan from one bank. The other conviction resulted from the respondent's knowing failure to disclose numerous debts to several banks in connection with his application for a loan from another bank.

895 P.2d at 544. We disbarred Hilgendorf. *Id.* at 545. The hearing board noted the similarities between *Hilgendorf* and the present case, but opted for a lengthy suspension because the respondent has not been convicted of any crimes arising out of the facts of this case. We have not considered the absence of actual criminal charges a significant distinguishing characteristic for disciplinary purposes. As we said in *People v. Chappell*, 927 P.2d 829, 831 (Colo.1996):

Given the seriousness of the respondent's conduct in aiding her client to violate the custody order resulting in the client being charged with a felony, the fact that the respondent has not been charged or convicted of an offense is not important for disciplinary purposes. See C.R.C.P. 241.6(5) (any act or omission violating the criminal laws of a state or of the United States constitutes ground for lawyer discipline; provided that conviction thereof in a criminal proceeding shall not be a prerequisite to the institution of disciplinary proceedings, and provided further that acquittal in a criminal proceeding shall not necessarily bar disciplinary action); *People v. Morley*, 725 P.2d 510, 514 (Colo. 1986) (conviction of criminal offense is not a condition precedent to attorney disciplinary proceedings involving the offense, nor is acquittal a bar).

■ In his response to the order to show cause, the respondent advances a number of reasons why a lengthy suspension, rather than disbarment, is appropriate in this case. He points out a number of cases from other

jurisdictions that have imposed suspensions in arguably similar circumstances.

In *Matter of LaVigne*, 146 N.J. 590, 684 A.2d 1362 (1996), the New Jersey Supreme Court suspended the lawyer for three years rather than disbarring him. In a complex real estate transaction involving the lawyer and a number of friends and clients, the lawyer failed to safeguard his clients' funds, and he made numerous misrepresentations both to clients and third parties including banks and title companies. *Id.*, 684 A.2d at 1371. The court nevertheless declined to disbar the lawyer because it did not

> find in this record, however, clear and convincing evidence of either knowing misappropriation or of conduct so venal as to persuade us that respondent should never again be permitted to practice law. While respondent benefitted from the deal by acquiring [certain real property], he did meet or exceed all requirements imposed on him under the contract. Thus ... he derived no unfair advantage from the transactions.

*Id.* at 1372. In fact, the court characterized the lawyer's issuance of inaccurate disclosure closing statements and title certifications as "gross negligence" rather than actual dishonesty, apparently because of the lawyer's negligent reliance on a third-party mortgagee's misrepresentations. *Id.* The court nonetheless noted that the case was a close one as to whether disbarment or a lengthy suspension was appropriate. *Id.* at 1373.

We believe that the respondent's conduct in this case is more properly characterized as dishonest rather than grossly negligent. The hearing board found that the respondent and the other participants submitted fraudulent documents to Pacific First with the intention of inducing the lender to give them money. Pacific First relied on those representations and as a result suffered significant harm. While it may not have been established by clear and convincing evidence that the respondent knew of all the false submissions to the lender, the board found that he knew that some of the documents were fraudulent. We therefore do not consider the result in *LaVigne* to suggest more lenient discipline in this case.

In *In re Strid*, 487 N.W.2d 891, 893 (Minn. 1992), the Minnesota Supreme Court suspended the lawyer for one year for fraudulent conduct consisting of misrepresenting the status of the title to the lawyer's parents' property in order to obtain a loan from a third party who wanted the property as collateral to secure the loan. In 1984, the lender believed that he was making a loan directly to the lawyer and that the lawyer himself owned the property. *Id.* The lawyer made payments on the loan until 1989 when he had a disabling heart attack. *Id.* The court noted that the lawyer "has made no restitution and is probably unable to do so. He is permanently disabled, is in poor health, and is not currently practicing law." *Id.* at 895.

The lawyer's conduct in *Strid* is similar to the misconduct in *People v. Pierson*, 917 P.2d 275, 276 (Colo.1996), where we suspended the lawyer for misrepresenting to the purchasers of his property that the title to the property was free and clear of all encumbrances. We rejected the hearing panel's recommendation of suspension for one year and one day in favor of a three-year suspension, but we also noted that "[t]he seriousness of the respondent's dishonest conduct in conjunction with his default could easily warrant disbarment." *Id.* at 277.

The lawyer in *The Florida Bar v. Van Stillman*, 606 So.2d 360, 363 (Fla.1992) was suspended for one year and thereafter until establishment of proof of rehabilitation. The lawyer had made misrepresentations to lending institutions in connection with multiple real estate transactions. *Id.* at 361–63. In reaching its conclusion that a one year suspension was warranted, the Florida Supreme Court stated:

> We are aware, as Stillman argues, that we have not usually allowed substantial discipline in cases involving misrepresentations to lending institutions. *See The Florida Bar v. Nuckolls*, 521 So.2d 1120 (Fla.1988); *The Florida Bar v. Siegel*, 511 So.2d 995 (Fla.1987); *The Florida Bar v. Beneke*, 464 So.2d 548 (Fla.1985). The first of these cases resulted in a public reprimand, and the last two resulted in 90–day suspensions. However, we believe that the overall pattern of misconduct here is so severe,

involving so many separate acts of fraudulent conduct, as to require harsher discipline.

606 So.2d at 363. After comparing the conduct in *Van Stillman* with the conduct in this case, and with the discipline suggested by the ABA *Standards,* which is not mentioned in *Van Stillman,* we continue to find a suspension inappropriate in the present case.

■ We also do not find persuasive the respondent's distinction between fraudulent conduct which is merely "knowing," and conduct which is "intentional." In fact, we have disbarred lawyers for dishonest conduct when that conduct has caused substantial damage, whether or not the conduct could technically be characterized as "intentional." In *People v. McDowell,* 942 P.2d 486, 493–494 (Colo.1997), the lawyer asserted that he should not be disbarred because his actions in disbursing funds from his trust account contrary to his directions " 'were clearly not intentional or knowing conversion, fraud, deceit or misrepresentation, which is the standard that must be applied for disbarment.' " *Id.* at 493. In rejecting that argument, we cited *People v. Sims,* 913 P.2d 526 (Colo. 1996), a case in which we disbarred a lawyer who claimed that he could not have knowingly misappropriated funds he held in his trust account for third parties because he was only acting on the instructions of his client. *Id.* at 530. In *Sims* we said that

> "[u]nder certain circumstances, an attorney's conduct can be so careless or reckless that it must be deemed to be knowing and will constitute a violation of a specific disciplinary rule. *State ex rel. Nebraska State Bar Ass'n v. Holscher,* 193 Neb. 729, 230 N.W.2d 75, 79 (1975). We believe that the element of scienter is shown with respect to a violation of DR 1–102(A)(4) when it is established that the attorney "deliberately closed his eyes to facts he had a duty to see ... or recklessly stated as facts things of which he was ignorant." *United States v. Benjamin,* 328 F.2d 854, 862 (2d Cir.) (holding that government could meet its burden of proving willfulness in a prosecution for conspiracy to defraud in sale of unregistered securities by showing that defendant auditor had deliberately closed his eyes to facts that were plainly to be seen or recklessly stated as facts things of which he was ignorant), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964)."

*Id.* (quoting *People v. Rader,* 822 P.2d 950, 953 (Colo.1992)). Hence, we reject the respondent's claim in this case that we should recognize a distinction between "knowing" and "intentional" dishonest conduct.

The respondent has not been previously disciplined, which is a mitigating factor. *See* ABA *Standards* 9.32(a). However, as we said in *Hilgendorf,* 895 P.2d at 545, "[a]lthough the respondent has no previous history of discipline, this fact alone does not counterbalance the gravity of his misconduct." In addition, even if the respondent actually lost money in these real estate schemes, we find no persuasive mitigation. Considering the seriousness and extent of the dishonesty in this case, which was driven entirely by the respondent's self-interest and his greed, and which therefore reflects seriously and adversely on his ability to practice law, we conclude that the respondent must be disbarred.

Finally, the respondent raises the issue of restitution to Ellen Pence. The hearing board recommended that "prior to any petition for reinstatement and as a condition for reinstatement, the Respondent must demonstrate that he has made full restitution to Ellen Pence for the amounts she has paid to Pacific First Mortgage or still owes to Pacific First Mortgage...."

■ The respondent's first objection is that he should not be required to make restitution to Pence because she participated in the fraudulent scheme to sell the respondent's home only because her husband pressured her, and the respondent did not even meet her until the closing. The board's findings make it clear that the respondent bears significant responsibility for Pence's loss. The fact that others, not before the court in this lawyer discipline proceeding, may also be at fault, is unimportant for our purposes. The very fact that he still denies responsibility for Pence's loss reinforces our conclusion that he must make restitution to her as one

way of demonstrating that he has been rehabilitated.

█ His second objection is that the amount of restitution is not a determinable obligation at this time since she is making monthly payments and might "negotiate a lump-sum settlement with Pacific First." The respondent is afraid that if he is required to make restitution of the amounts Pence still owes to Pacific First Mortgage, she may experience a windfall. That the innocent victim of the respondent's fraudulent conduct *may*, at some point in the future, receive a benefit from the respondent is not a sufficient reason to choose the alternative course which is to permit the respondent to make no restitution at all to anyone. We therefore accept the hearing board's recommendation regarding restitution.

### III.

It is hereby ordered that David L. Jackson be disbarred and that his name be stricken from the list of attorneys authorized to practice before this court, effective thirty days after this opinion is released. It is also ordered that, prior to any application for readmission and as a condition thereof, the respondent must make full restitution to Ellen Pence for the amounts she has paid to Pacific First Mortgage, and still owes to Pacific First Mortgage. It is further ordered that the respondent pay the costs of this proceeding in the amount of $2,703.48 within ninety days of the date of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202.