**In the Matter of Daniel R. ROSEN.**

**No. 07SA363.**

Supreme Court of Colorado,
En Banc.

Dec. 15, 2008.

Charles E. Mortimer, Jr., Assistant Regulation Counsel, Denver, CO, Attorney for Complainant–Appellant.

Cecil E. Morris, Jr., Karen E. Lorenz, Denver, CO, Attorneys for Respondent–Appellee.

Justice COATS delivered the Opinion of the Court.

The Attorney Regulation Counsel appealed an order of a disciplinary hearing board, dismissing one of the six claims for relief filed against Daniel R. Rosen and ordering probation for the remaining five. The regulation counsel challenges as clearly erroneous the board's finding that he failed to prove by clear and convincing evidence the commission of attempted theft. He further challenges as unreasonable the board's imposition of a six-month suspension, stayed pending a commensurate period of probation, arguing that this court should increase that discipline to a suspension of a year and a day, without probation.

Because the hearing board did not err in finding unproven the sixth claim for relief and because the form of discipline imposed by the board for the respondent's proven violations is not unreasonable, its order is affirmed.

## I.

In February 2007, the Attorney Regulation Counsel filed a complaint against attorney Daniel R. Rosen, asserting six separate claims for relief. The first five alleged various violations of the prohibition against knowingly making a false statement of material fact or law to a person other than a client, found at Rule 4.1(a) of the Colorado Rules of Professional Conduct. The complaint asserted that these transgressions were designated misconduct by Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation), and made grounds for discipline by C.R.C.P. 251.5(a). The sixth claim alleged that the respondent committed the crime of attempted theft, in violation of sections 18–4–401 and 18–1–201 of the Colorado Criminal Code, which are designated attorney misconduct by Rule 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer, other than by violating or attempting to violate the Rules of Professional Conduct, assisting another to do so, or doing so through the acts of another), and made sanctionable by C.R.C.P. 251.5(b).

All six of the claims for relief arose from Rosen's conduct in connection with a settlement negotiation with Safeco Insurance Company on behalf of his client, David Bourelle. Before the hearing, the parties entered into a stipulation of facts. Few if any facts, apart from the respondent's intent, were therefore disputed.

The board found that the respondent is a sole practitioner with a high-volume practice specializing in the settlement of personal injury claims. Bourelle engaged the respon-

dent in February 2004, to represent him with regard to injuries he suffered in an automobile accident. At his client's direction, the respondent prepared a settlement demand for $65,000, but before he could deliver it, he was informed by his client's brother that the client had died. The respondent nevertheless delivered to Safeco the written settlement demand, including a demand for damages for pain and suffering.

In April the respondent rejected a counteroffer of $23,000, indicating in his response to Safeco that his client needed additional medical treatment. Weeks later, after learning for the first time that a claim for pain and suffering abates upon the death of the injured party, the respondent received a second offer to settle, along with a check for $31,765 and a release from liability, requiring his client's signature. Still without notifying Safeco of his client's death, the respondent faxed a copy of the release to his client's brother in California, along with a closing settlement statement, indicating that the client's share of the settlement would be $12,579.29.

Only after sending the closing settlement statement did the respondent come to understand that the Bourelle family was not taking action to probate the estate, and therefore his client's father was not, as he had earlier thought, in a position to sign the release on behalf of the estate. In the meantime, the client's brother communicated his concern about the propriety of signing the release to a member of the respondent's staff and, without notifying the respondent, advised Safeco that the family had been provided the release and had been asked to sign it. Finally in August, nearly three weeks after the brother's call, the respondent informed Safeco by letter that his client had died.

Even in this letter, however, the respondent expressly indicated that his client had died subsequent to the settlement offer, and he offered to hold the check until a personal representative was appointed. During the ensuing months, the respondent avoided being interviewed by Safeco's investigator and once more indicated by letter that he had only recently become aware of the client's death. Ultimately, in February 2006, when

Safeco requested that its settlement check be returned, the respondent immediately complied.

At the disciplinary hearing, the respondent testified that no other client of his had ever died during the course of his representation, and as a result he was unaware of the effect a client's death would have on the attorney-client relationship. He admitted his misrepresentations constituting the violations alleged in the first five claims for relief, but he denied ever having an intent to steal money from Safeco. He testified instead that his initial settlement demand, delivered after his client's death, was made in ignorance of its impropriety, and that his subsequent delay in notifying Safeco, as well as his misrepresentations concerning the timing of his client's death, were merely part of an attempt to extricate himself from an embarrassing situation rather than an attempt to increase his fee.

In consideration of the respondent's explanation that once he learned of its significance, he always intended his client's death to become known to Safeco, the hearing board was unconvinced that he acted with an intent to deceive Safeco into settling for damages to which his client's estate was not entitled. It therefore dismissed the sixth claim for relief, which alleged an attempt to commit the crime of theft. Although the board considered the respondent's admitted misrepresentations to Safeco to be violations of his duty to the legal profession, which by their very nature caused injury to the profession, it ultimately concluded that the public would be adequately protected by imposing and staying a six-month suspension, pending successful completion of a similar period of probation and ethics school.

The Attorney Regulation Counsel appealed, challenging both the board's failure to find the commission of attempted theft and its sanction of probation.

## II.

With regard to its sixth claim for relief, the Attorney Regulation Counsel assigns error to the board's failure to be convinced that the respondent acted with the

specific intent to permanently deprive Safeco of its property. Rather than disputing the board's understanding of the elements of either criminal attempt or theft, *see* §§ 18–2–101(1),[1] 18–4–401(1),[2] C.R.S. (2008), regulation counsel marshals the evidence presented at the hearing disputing the respondent's denial of any such intent and asks this court to find the elements of attempted theft established.

■ In a disciplinary proceeding, this court is of course not the fact finder. *In re Haines*, 177 P.3d 1239, 1244 (Colo.2008). It may review and reverse the hearing board's order only for legal error; for clearly erroneous findings of fact; or for imposing unreasonable discipline. C.R.C.P. 251.27(a). A determination of the board that an allegation of the complaint has not been proven to its satisfaction by clear and convincing evidence, however, is not itself a finding of fact. Quite the contrary, it is the absence of, or inability to make, a factual finding and is therefore not subject to review according to the clearly erroneous standard.

■ To the extent that reasonable people could not differ as to the proof of attempted theft presented at the hearing, the denial of a motion for directed verdict, *see* C.R.C.P. 50, or motion notwithstanding the verdict, *see* C.R.C.P. 59, might nevertheless be subject to reversal for legal error. No such motion was made in this case, and we have previously held, in the context of civil litigation, that an appellate court cannot simply direct a verdict or order a judgment notwithstanding a verdict, in the absence of the denial of either motion by the trial court. *See Feiger, Collison & Killmer v. Jones*, 926 P.2d 1244, 1249 (Colo.1996) (whether either party is entitled to judgment as a matter of law is preserved by making a motion for directed verdict or judgment notwithstanding the verdict); *Olmstead v. District Court*, 157 Colo. 326, 331, 403 P.2d 442, 444 (1965) (we will not pass judgment on a post-trial motion if not first ruled upon by the trial court).

Because, however, we have emphasized our plenary authority in matters involving attorney regulation, *see* C.R.C.P. 251.1(d), and because the unique role of the Presiding Disciplinary Judge, requiring him to sit as both judge and panel member, may render largely meaningless the function of a motion for judgment notwithstanding the verdict, we decline to so rigidly limit our review in disciplinary matters. Nevertheless, considering the regulation counsel's challenge according to the standard required for a motion for directed verdict or motion for judgment notwithstanding the verdict, we cannot say, as a matter of law, that no reasonable fact finder could be unconvinced by the circumstantial evidence of the respondent's subjective intent to permanently deprive presented at the hearing, and instead believe the respondent's own explanation for his actions.

### III.

■ In determining the proper sanction for attorney misconduct, we have consistently recognized the American Bar Association Standards for Imposing Lawyer Sanctions (1992) as our guiding authority. *In re Fischer*, 89 P.3d 817, 819–20 (Colo.2004). The ABA Standards describe a range of available sanctions, mirroring those permitted by C.R.C.P. 251 (including probation), and they suggest a detailed conceptual framework for choosing an appropriate sanction under the circumstances of each individual case. *See* ABA Standards 2, 3. That framework entails consideration of the duty violated by the

1. A person commits criminal attempt if, acting with the kind of culpability otherwise required for commission of an offense, he engages in conduct constituting a substantial step toward the commission of the offense.
§ 18–2–101(1), C.R.S. (2008).

2. A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and: (a) Intends to deprive the other person permanently of the use or bene-

fit of the thing of value; or (b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit; or (c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use and benefit; or (d) Demands any consideration to which he is not legally entitled as a condition of restoring the thing of value to the other person.

§ 18–4–401(1), C.R.S. (2008).

respondent, his mental state, actual or potential injury caused by his misconduct, and the existence of other aggravating or mitigating factors. ABA Standard 3.0; *Haines,* 177 P.3d at 1250; *Fischer,* 89 P.3d at 820.

More particularly, the Standards initially analyze misconduct in terms of the class of persons or entities to whom specific duties are owed: clients, the public, the legal system, or the legal profession. The need for, and therefore the appropriateness of, any particular sanction is circumscribed, in the first instance, by the person or entity to whom the breached duty is owed; but within that class or category of breaches, the appropriateness of sanctions is further refined according to the offending lawyer's mental state, the injury actually caused or threatened by the lawyer's conduct, and various other aggravating and mitigating factors, unique to the attorney and his disciplinary history. Depending on the class of duty violated, the severity of sanctions considered necessary to protect the public may vary considerably.

Unless deceit or misrepresentation is directed toward a client, *see* ABA Standard 4.6, a tribunal, *see* ABA Standard 6.1, or the legal profession itself (as, for example, by making false representations in applying for admission to the bar), *see* ABA Standard 7.0, it is considered by the ABA Standards to be the violation of a duty owed to the public, *see* ABA Standard 5.0. As the violation of a duty owed to the public (as distinguished from a client, a court, or the profession), even conduct involving dishonesty, fraud, deceit, or misrepresentation, as long as it falls short of actual criminality or comparable intentional conduct seriously adversely reflecting on one's fitness to practice law, should generally be sanctioned only by reprimand, or censure. *See* ABA Standard 5.13. Suspension as a sanction for knowingly dishonest conduct directed toward someone other than a client or tribunal is generally reserved for engaging in criminal conduct. *See* ABA Standard 5.1.

Although dishonesty that is unrelated to the practice of law may merit no professional regulation at all, dishonesty that is related to the practice of law, even though it does not directly breach duties to a client, the legal system, or the profession, cannot, however, go completely undisciplined. *See In re Lamberis,* 93 Ill.2d 222, 66 Ill.Dec. 623, 443 N.E.2d 549 (1982) (attorney censured for knowingly plagiarizing in master's thesis, although there was no violation of the law); *cf. In re Pautler,* 47 P.3d 1175 (Colo.2002) (public prosecutor suspended subject to probation for misrepresenting himself as public defender to a suspect because such deceitful conduct perpetuated public misperception of the profession, breaching public and professional trust).

The ABA Standards also recognize the appropriateness of ordering probation as a sanction under certain circumstances, whether alone or in conjunction with another form of discipline, like reprimand, admonition, or even suspension. *See* ABA Standard 2.7. Generally, the Standards support the view that probation is appropriate whenever the public will be adequately protected by permitting the lawyer to continue to practice under supervision or subject only to particular educational or other conditions. In addition to imposing private admonition, public censure, a definite period of suspension, or disbarment, Rule 251.19(b) of our own rules specifically authorizes the board to "enter other appropriate orders including, without limitation, probation." *See* C.R.C.P. 251.19(b)(3).

The Attorney Regulation Counsel reasons that the discipline ordered by the board in this case was inadequate and unreasonable, largely by contrasting it with longer suspensions imposed in cases involving false representations made for the purpose of acquiring property or benefits to which the offending attorneys were not legally entitled. *See People v. Mitchell,* 969 P.2d 662 (Colo.1998) (attorney suspended one year for material misrepresentations on applications for a liquor license and loan); *People v. Rudman,* 948 P.2d 1022 (Colo.1997) (attorney suspended three years for making misrepresentations to the sole beneficiary of an estate for which the attorney acted as the personal representative in an effort to keep assets previously obtained from the deceased for himself and increase his legal fees); *People v. Jackson,* 943 P.2d 450 (Colo.1997) (attorney disbarred

for involvement in two fraudulent real estate transactions causing losses to loan company and innocent homebuyer of almost $500,000); *People v. Koller,* 873 P.2d 761 (Colo.1994) (attorney suspended one year for violating fraudulent conveyance statute in attempt to hinder, delay, or defraud a legal malpractice judgment creditor); *People v. Kearns,* 843 P.2d 1 (Colo.1992) (attorney suspended for inducing innocent party to enter into loan and converting proceeds for his own benefit, causing over $300,000 in losses). Apart from the fact that individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases, in this case the board expressly found the evidence insufficient to establish an intent to wrongfully deprive Safeco of its property. Rather, it was able to conclude only that the respondent, by referring to his client in the present tense as if he were still alive, and in misinforming Safeco about the actual timing of his client's death and the respondent's own awareness of it, was knowingly deceitful.

Although the board appears to have mistakenly considered the respondent's behavior to be the breach of another duty owed to the profession rather than a duty owed to the public, in the absence of intentional or criminal conduct, its error in this regard created a presumption of more, rather than less, severe discipline. In general, section 7 of the ABA Standards is reserved for other duties owed to the profession, separate and apart from those owed to clients, the public, or the legal system; and in particular, Standard 7.2,[3] upon which the board relied, requires injury or potential injury to a client, the public, or the legal system, as distinguished from the generalized injury to the public's perception of the legal profession caused by virtually every act of attorney dishonesty. Nevertheless, however, the respondent has not challenged the board's order of suspension as overly harsh; and in any event, after considering all of the circumstances and aggravating and mitigating factors, the board tempered its six-month suspension by finding probation to be appropriate.

3. Under ABA Standard 7.2, suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty

The ABA Standards clearly contemplate that after applying its scheme to arrive at a presumptive form and range of discipline, a disciplining authority will always consider any other factors, unique to the particular respondent, in the particular case, that should mitigate or aggravate that presumptive discipline. ABA Standards 3.0 cmt. 9.2, 9.3. While the ABA Standards enumerate a number of such aggravating and mitigating factors, they are expressly intended as exemplary and are not to be applied mechanically in every case. In this case, the board considered it significant that the respondent had practiced for over twenty years without any prior discipline; that he disclosed his lack of candor to Safeco rather than negotiating their check; that he cooperated fully with the Attorney Regulation Counsel's investigation into his conduct; and that he was genuinely remorseful. In aggravation the board noted only that the respondent's conduct constituted a pattern of dishonest behavior, which was the precise allegation of misconduct he was found to have committed, and that he had practiced in this arena for over twenty years, although incompetence was not among the transgressions with which he was charged.

In light of these findings, we cannot say that a decision to make the respondent's suspension contingent upon failing to successfully complete a commensurate period of probation, including an ethics course, was unreasonable.

### IV.

Because the hearing board did not err in finding the sixth claim for relief unproven and because the form of discipline imposed by the board for the respondent's proven violations is not unreasonable, its order is affirmed.

Justice EID dissenting.

The Hearing Board found that Rosen violated Colorado Rules of Professional Conduct

owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.

8.4(c)[4] and 4.1(a)[5] by taking actions that were "knowingly deceitful" during his negotiations with Safeco. Yet the Board imposed a penalty of just six months of probation. Because I believe that Rosen's conduct was egregious, I agree with attorney regulation counsel that Rosen's punishment should be increased to suspension of a year and a day, without probation. I therefore respectfully dissent.

Rosen was negotiating a settlement with Safeco when, on February 18, 2005, he learned of Bourelle's death. On April 12, 2005, Safeco made its first counteroffer of $23,000, which included $9,000 for pain and suffering. Although Rosen was unaware that death affected pain and suffering damages when he made a $50,000 counteroffer on April 25, 2005, he learned just three days later that pain and suffering damages abate upon the death of a client. In other words, by the end of April 2005, Rosen knew that he was negotiating with Safeco for a settlement that contained damages to which no one was entitled—neither he, in the form of a one-third contingency fee, nor his client's heirs. Yet Rosen chose not to disclose Bourelle's death to Safeco at this point or at any point in the negotiations.

When Rosen received Safeco's next offer of $31,750, he promptly accepted it and settled the case. The settlement exceeded the amount of economic damages involved in the case and included damages for pain and suffering, but again, Rosen chose not to disclose his client's death to Safeco.

Once the case was settled, Safeco forwarded to Rosen a liability release and a check. In order to cash the check and collect his contingency fee, Rosen needed to obtain a signature on the liability release. Because he could not obtain Bourelle's signature, he turned to Bourelle's family, forwarding a copy of the release to Bourelle's brother. On or around July 25, 2005, the brother, seeking clarification about the settlement, contacted Safeco and informed the company of Bourelle's death. Safeco asked him not to tell

Rosen of the call and subsequently began an investigation. The brother did not tell Rosen about the call, nor did he sign the release.

Upon learning that Bourelle's family would not sign the release, Rosen took initial steps toward commencing a probate action, hoping to have the release signed by a fiduciary of the estate. This option required Safeco to know that Bourelle had died. Consequently, on August 11, 2005 Rosen sent Safeco a letter. He was careful, however, to preserve the pain and suffering damages contained in the settlement amount by stating that Bourelle died *"subsequent"* to the settlement.

Only after Rosen learned that a Safeco investigator wanted to speak with him did he admit that his client had died, though again, he failed to disclose the whole truth. In his final letter to Safeco, Rosen stated that he *"recently"* learned that Bourelle had died prior to the settlement. His letter sought to negate any implication that he had entered into a settlement agreement, which included pain and suffering damages, while knowing his client was deceased. Upon Safeco's request, Rosen returned the check to Safeco in February of 2006—a full ten months after he learned that pain and suffering damages abate upon a person's death.

It is undisputed that Rosen knew pain and suffering damages abated on death, yet he negotiated a settlement that would include such damages and repeatedly misled Safeco into thinking that such damages were appropriate in this case. Moreover, he took the steps that would be necessary to cash the settlement check and eventually obtain his one-third contingency fee from a settlement amount that included pain and suffering damages. At first, Rosen hoped Bourelle's family would simply sign the release form on Bourelle's behalf. After that failed, he sought a probate action where a representative could sign for Bourelle. It appears that Rosen was saved from cashing the check only by chance—that is, by the actions of Bou-

**4.** "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Colo. RPC 8.4(c)

**5.** "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person." Colo. RPC 4.1(a)

relle's family, who refused to sign the release and then alerted Safeco.

The Hearing Board declined to find that Rosen committed attempted theft because it concluded that the People failed to prove that Rosen had the "conscious objective" of permanently depriving Safeco of the settlement funds attributable to pain and suffering to which no one was entitled. But the Board did find that Rosen "acted dishonestly and deceitfully in his negotiations with Safeco" and that he "engaged in multiple misrepresentations" constituting "a pattern of misconduct." Indeed, as the Board summed it up, "[I]t was more than mistake or misjudgment on [Rosen's] part to continue to deceive Safeco after he learned of his client's death and its impact on settling the claim. Such actions were knowingly deceitful." In my view, given the egregious conduct that occurred in this case, the Board's probationary sentence is inadequate.

It is somewhat unclear why the Board concluded that probation was a sufficient penalty in this case. The Board may have been influenced by (although it does not expressly reference) Rosen's explanation that his conduct was motivated by embarrassment. *See* maj. op. at 118. Embarrassment, however, only goes so far. Embarrassment does not explain why Rosen vigorously pursued the steps necessary to cash the settlement check—that is, the fact that he sought a signature on the release form from his client's family, and, when that failed, sought to establish a probate estate so that a representative could sign the document. Nor does it explain why he would specify in a letter to Safeco discussing probate proceedings that his client died *"subsequent"* to the settlement, rather than simply stating that his client had died. Finally, embarrassment does not explain why Rosen returned the check *only after* being confronted by Safeco. Rosen may have been embarrassed, but he was still "knowingly" and repeatedly deceitful, as the Hearing Board concluded.

Finally, the Board noted that a "significant mitigating factor" in the case was that Rosen has practiced law for over twenty years with no record of discipline. Yet the Board cited the same factor in aggravation. As the Board concluded, Rosen "has practiced law for over twenty years as a personal injury lawyer who specializes in settling cases before formal litigation." Although not charged with incompetence, Rosen should have known that pain and suffering damages abate upon death; certainly, upon learning that fact, a competent and ethical lawyer would have disclosed a client's death in a timely manner, rather than concealing that fact to enable a settlement that included pain and suffering damages—damages to which no one was entitled. *See* Colo. RPC 1.1 ("A lawyer shall provide competent representation to a client"); Colo. RPC 4.1. cmt. 1 ("A lawyer is required to be truthful when dealing with others on a client's behalf"); *see also Virzi v. Grand Trunk Warehouse & Cold Storage Co.*, 571 F.Supp. 507, 508 (E.D.Mich.1983) (voiding settlement agreement because plaintiff's attorney had "an absolute ethical obligation" to inform both defendant's counsel and the court of plaintiff's death and failed to do so).

Attorney regulation counsel argues that, given the egregious nature of Rosen's conduct, the penalty should be increased to suspension of a year and a day, without probation. I agree, and therefore respectfully dissent from the majority's opinion finding otherwise.

I am authorized to state that Chief Justice MULLARKEY and Justice BENDER join in this dissent.