OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b) -
I. SUMMARY
While serving as a shareholder and director of his family's corporation, Respondent violated rules governing conflicts of interest by acting both as counsel to the corporation and as an interested party in two interested transactions. Respondent did not obtain the necessary consent from the corporation to enter into the transactions but rather concealed them from the board of directors in order to obtain a personal benefit. Given the facts and cireum-stances of this case, the Hearing Board concludes that Respondent should be suspended for six months and shall be required to take and pass the Multistate Professional Responsibility Exam before seeking reinstatement pursuant to C.R.C.P. 251.29(b).
II. PROCEDURAL HISTORY
The People filed a complaint in this case on September 24, 2014, alleging violations of Colo. RPC 1.7(a)(2), 1.8(a), and 8.4(c). Respondent filed his answer on October 20, 2014. The PDJ held a scheduling conference on October 28, 2014, and set the hearing for April 22-24, 2015.) .
During the hearing, the Hearing Board considered the stipulated facts and testimony from Respondent, Mary Chapman, Peggy Levinson, Lamont Miller, Steve Miller, Anthony Van Westrum, Gayle Young, and David Zen. The PDJ admitted stipulated exhibits 81-89.
After the close of the People's evidence, Respondent moved for a directed verdict on all of the People's claims. Examining the evidence in the light most favorable to the People, the PDJ denied Respondent's motion.[1] Respondent renewed his motion on *1136 April 28, 2015, and the PDJ denied it on May 6, 2015.
III. FINDINGS OF FACT AND RULE VIOLATIONS
Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 25, 1989, under attorney registration number 18925.[2] He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[3]
The Hearing Board considered the testimony of each witness, the stipulated facts, and all admitted exhibits and finds the following facts were established by clear and convincing evidence. Where not otherwise indicated, these facts are drawn from testimony provided at the hearing.
Background
Respondent and his four siblings-Mary Chapman (formally Hiner), Lamont Miller, Steve Miller, and Peggy Levinson (formally Miller)-are the children of the late Margaret Patricia Miller (known as Patricia Miller). Together, they owned and operated a family business, Shamrock, Inc. Shamrock was incorporated in 1978, and the bylaws were enacted that same year.[4] Ms. Miller and her five children were the sole shareholders of Shamrock and members of its board of directors ("the Board").[5] Ms. Miller was the president and Respondent the vice president of Shamrock.[6]
Shamrock's principal assets were a mobile home park, a duplex, and a TD Ameritrade investment account. Ms. Miller's residence was located on the mobile home park property. Ms. Miller's lot also included two small studio apartments, both with a bedroom and a bath but no kitchen. These units rented for $300.00 per month. Steve Miller has lived in one half of the duplex for over twenty years, and at various times other siblings, including Respondent, have resided in the other half.
Shamrock's articles of incorporation, enacted in July 1978, permit an individual director to be a party to or to be financially interested in a contract or transaction with Shamrock "provided that the fact that he ... is so interested shall be disclosed or shall have been known to the board of directors, or a majority thereof." [7]
Respondent, a certified public accountant, was admitted to the Colorado bar in 1989. Thereafter, he served as Shamrock's attorney.[8] Respondent never entered into a written fee agreement with Shamrock.[9] In 1999, Respondent moved to American Samoa and opened a law practice. He remained there until 2008, when he returned to Colorado to help his mother with Shamrock. Respondent testified that once he returned, he and his mother entered into an oral agreement under which he would manage Shamrock.
Until late 2010, Ms. Miller managed Shamrock's day-to-day operations."[10] According to Mary Chapman, these duties included accounting, preparing checks, managing the mobile home park, supervising tenants, and collecting rents. Mary Chapman said that her mother refused to pay herself a salary for this work, despite her children's urging. Ms. Miller's health declined in September 2010, and she had trouble reading documents and preparing checks due to macular degeneration. Steve Miller acted as his mother's fulltime caretaker after she became ill. *1137 Steve Miller testified that in September and October 2010, his mother's memory was bad and, due to bone and muscle deterioration, she was bedridden. p
As of October 7, 2010, Ms. Miller could not manage Shamrock. At this point, Mary Chapman testified, her siblings who lived nearby "pitched in to help" with Shamrock's operations, including by collecting rent and making deposits. None of her siblings, as far as Mary Chapman knew, were able to manage Shamrock fulltime, nor did Ms. Miller or the Board appoint anyone in an official capacity as Shamrock's manager. Ms. Miller passed away on December 13, 2010.[11]
The Management Agreement
On September 4, 2010, Respondent, Steve Miller, and Mary Chapman had a heated argument concerning the contents of their mother's estate, including a safe at their mother's house, which they planned to inventory. Respondent's and his siblings' testimony made clear that by this time their relationship was hostile.
Three days later, on September 7, 2010, Respondent executed an agreement appointing himself as Shamrock's manager. The management agreement was signed by Respondent as vice president and by Ms. Miller as president.[12] It was also signed by a witness, who was one of Ms. Miller's caregivers at the time.[13] Respondent drafted the management agreement as Shamrock's attorney. He did not disclose this agreement to his siblings. |
The terms of the management agreement included in part:
PARTIES & PURPOSE
Patricia Miller is no longer able to continue to manage the Corporation; and Peggy Levinson, Mary Chapman, and Lamont Miller do not have the time or desire to accept the responsibility of full management....
1. [Respondent] is a professional whose CV is incorporated by reference. [Respondent] is willing to continue managing the Corporation consistent with past management by Patricia Miller. [Respondent] is and has been a managing officer (V.P.) of the Corporation and is the more knowledgeable person in a position to manage the Corporation.
2. Continued management under the conditions existing prior to September 6, 2010, has and will result in extreme emotional distress to [Respondent].
3. Procrastination in the decision making process has been costly both to the Corporation and to the health and personal finances of some, if not all, of the Corporation's SHAREHOLDERS.
DEFINITIONS AND INTENT
. The intent is to eliminate, to the extent possible, dissention [sic] among SHAREHOLDERS and to profitably manage the Corporation for so long as the Corporation shall exist.
DURATION
[This agreement shall be binding on the Parties for the shorter of the existence of the Corporation or 60 months.
DUTIES, RIGHTS AND RESPONSIBILITIES
Time being of the essence, [Respondent] shall be responsible for managing the Corporation and shall have all rights needed to fulfill those responsibilities.
"ot ook
COMPENSATION
[Respondent] shall be paid for his services in a manner consistent with the skills and services provided. In addition to a monthly salary of $2,000.00, [Respondent] shall receive a performance bonus of 50% of any measurable benefit inuring to the Corporation by virtue of his services subsequent to 1/1/2009.
BREACH AND REMEDIES
In addition to nonperformance of any of the above, interference in [Respondent's] management, including any unjustified delay and any undocumented criticism, ver *1138 bal or otherwise, shall constitute a breach of this agreement....
In the event of a breach by [Respondent] then liquidated damages shall be defined as a forfeiture of any unearned salary. In the event of a breach by anyone other than [Respondent], then it is agreed that a judicial determination of damages would be unnecessarily expensive, extremely difficult, and overly time consuming. Therefore any breach of this agreement shall be limited to liquidated damages consisting of the above bonus and 200% of the total salary [Respondent] would have received had there been no breach.[14]
On October 14, 2010, Respondent transferred $8,000.00 from Shamrock's TD Ameri-trade account into his COLTAF account.[15] Over time, he paid himself this $8,000.00 as bonuses under the terms of the management agreement."[16]
On March 15, 2011, Respondent advised his brother Lamont Miller via email that Ms. Miller had promised he could manage Shamrock for a period of five years"[17] In response, Lamont Miller asked Respondent to show him the "written instrument documenting a five-year contract engaging and authorizing [him] to manage Shamrock.[18] Respondent did not produce the management agreement.[19]
Respondent then paid himself another bonus on March 31, 2011. On that day, Respondent transferred $4,812.81 to his COLTAF gcecount from Shamrock's TD Ameritrade account.[20] Respondent contends that he earned $1,100.00 of these funds as bonuses under the management agreement.[21]
Each of Respondent's siblings testified persuasively at the hearing that they were unaware of the management agreement until April 2011. They first saw the agreement on April 4, 2011, when Respondent gave their attorney a copy of the agreement. Respondent's siblings stated that the management agreement was never received, authorized, or ratified by the Board. In fact, according to Peggy Levinson, the Board never agreed to appoint Respondent as Shamrock's manager or to pay him a salary or bonuses. The Board was also unaware of any oral agreement between Respondent and their mother.
In contrast, Respondent averred that every "word in the agreement was discussed openly" with his mother and his siblings between 2008 and 2010 during regular Board meetings. Specifically, he contends that the "Parties & Purpose" provision of the agreement was discussed openly with his siblings and ratified by the Board. He claims this ratification is supported in Board meeting minutes, though he was unable to produce any minutes at the hearing. He also asserted that the Board gave him and his mother authority to bind Shamrock individually, and that this authority is evidenced by his filing and signing Shamrock's tax returns on a yearly basis. He admitted that he did not give a copy of this agreement to his siblings prior to signing it, reasoning that because it had been "their practice in the past not to agree to anything." He did testify that he tried to deliver a copy of the agreement to Steve Miller and to Mary Chapman but they did not permit him to enter their homes. He then resorted to placing an unsigned copy of the agreement on a table inside his mother's house and then on a shelf in the entryway.
We do not find it plausible that the Board ratified the particulars or the language, particularly the extreme emotional distress provision. Additionally, Respondent's four siblings testified convincingly that none of them were aware. of the management agreement or its terms until 2011.
After Respondent's siblings learned of the management agreement, they held a special meeting of the Board on April 16, 2011. *1139 There, the Board voted to terminate Respondent as an officer and representative of Shamrock.[22] Peggy Levinson testified. that the Board gave Respondent notice of this meeting in compliance with Shamrock's bylaws. A shareholder meeting was also held on April 16, when the siblings elected a new Board. After these meetings, Respondent's siblings sent him a letter declaring the management: agreement "null and void" because it was undisclosed and not authorized by Shamrock's Board, as required by the articles of incorporation.[23] In the letter, the siblings also terminated Respondent as Shamrock's attorney.[24]
Respondent filed a complaint in Mesa County District Court on May 31, 2011, seeking a declaratory judgment that the management agreement was legally binding and enforceable.[25] After a three-day bench trial, the district court entered an order on August 2, 2018, finding Respondent liable for breach of fiduciary duty, civil theft, and conversion.[26] The court entered judgment against Respondent for $116,958.83, plus interest.[27] This amount included a $14,000.00 salary that Respondent drew under the management agreement, $4,182.00 in bonuses, and a $1,735.56 retainer and attorney's fees.[28]
The Lease Agreement
On April 1, 2011, Respondent, acting as vice president of Shamrock, executed a lease agreement between Shamrock and himself individually and on behalf of the Law Office of Paul Miller for the rental of his mother's former residence.[29] Respondent was the only signatory on this agreement.[30] The property consisted of a house, which had a small office in the front. - Under the terms of the lease agreement Respondent was to pay $100.00 a month to Shamrock in exchange for using the property "as a law office and as a private residence."[31] The People's expert witness, Anthony Van Westrum testified that the rental rate appeared to be unfairly low for the space, which included a house and an office. Respondent's siblings also testified that $100.00 a month rent was well below fair market value as they were leasing the two small studios for $300.00 a month.
Respondent paid himself half of $100.00 as a bonus under the terms of the management agreement.[32] Respondent did not notify his siblings about the lease agreement, nor did he seek their permission prior to entering into the agreement.[33]
In a letter dated May 6, 2011, Respondent's siblings notified him that the lease agreement was void and that they were terminating it.[34] They told Respondent to vacate the premises within ten days.[35] Respondent refused.[36]
On August 1, 2011, Respondent's siblings filed an eviction action against him in Mesa County County Court.[37] The county court issued an order on August 16, 2011, finding the lease agreement to be void and in violation of Shamrock's articles of incorporation.[38] The court entered judgment on behalf of Shamrock on August 9, 2012, for $34,709.00 *1140 in attorney's fees and $2,636.48 in costs, plus statutory post-judgment interest.[39]
Concurrent Conflict of Interest-Colo. RPC 1.7(a)(2)
The People allege that Respondent violated Colo. RPC 1.7(a)(2), which prohibits a lawyer from representing a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists where there is a significant risk that the representation of one or more clients will be materially limited by a personal interest of the lawyer.[40] Notwithstanding the existence of a concurrent conflict of interest, the lawyer may represent the affected client if the lawyer believes he can provide competent representation to the client and the client gives informed consent in writing.[41] A lawyer's own interests should not be permitted to have an adverse effect on representation of a client.[42] The People contend that Respondent violated this rule because his representation of Shamrock was materially limited by his own personal interest in receiving the benefits conferred by the management and lease agreements. They further aver that Respondent contravened this rule by personally entering into these agreements, as a party, without advising or obtaining the consent of Shamrock's Board, as required by Shamrock's articles of incorporation.
During the disciplinary hearing, Respondent conceded that he had a conflict of interest with Shamrock. We find clear and convincing evidence that Respondent's representation of Shamrock was materially limited by his personal interests in the management and lease agreements. Turning first to the management agreement, we find that by drafting and entering into this agreement, Respondent gave himself complete control over Shamrock and its assets. He gained this power without the Board's consent and by concealing this agreement from the Board. Per his own terms, if any members of the Board criticized his management decisions, they would be subject to severe liquidated damages. On its face, the management agreement also granted Respondent unfettered discretion to determine how he would be compensated. In fact, Respondent paid himself $18,182.00 under the terms of this agreement between September 2010 and March 2011.[43]
Respondent's representation of Shamrock was also materially limited by his personal interest in the lease agreement. Under the terms of this agreement, Respondent leased himself his mother's former residence and office for a mere $100.00 a month-a rate below fair market value. He then took $50.00 of this payment as a bonus under the terms of the management agreement-effectively achieving a fifty percent rent reduction.
Respondent remained Shamrock's attorney until April 16, 2011, when he was terminated by the Board. Despite this conflict, Respondent maintained that he provided competent representation to Shamrock. He did not offer any evidence demonstrating how he accomplished this task. In fact, the evidence demands the opposite conclusion. After entering into the management agreement-thus creating a conflict of interest with Shamrock-Respondent proceeded to draft and execute a second transaction in which he was an interested party. That transaction, too, he also concealed from the Board because he knew the Board would not approve it. He also refused to provide Lamont Miller a copy of the management agreement when asked. These two actions demonstrate that Respondent put his own personal interests above those of his client Shamrock, undermining his claim to competent representation.
Finally, because the Board was not aware of either of these two transactions, it was unable to give Respondent informed consent for him to continue to represent Shamrock from September 2010-the date he executed the management agreement-until his representation was terminated. The Hearing *1141 Board therefore concludes that Respondent violated Colo. RPC 1.7(a)@).
Prohibited Business Transactions Colo. RPC 1.8(a)
The People's next claim charges Respondent with violating Colo. RPC 1.8(a), which prohibits a lawyer from entering into a business transaction with a client unless (1) the terms on which the lawyer acquires an interest are fair and reasonable to the client, fully disclosed, and transmitted in writing in a manner that can be reasonably understood by the client; (2) the client is advised in writing and given a reasonable opportunity to seek the advice of independent counsel; and (8) the client gives informed consent in writing to the essential terms of the transaction and the lawyer's role in the transaction. The People contend that the terms of the management agreement and the lease agreement were not fair and reasonable to Shamrock, nor were they disclosed in writing to the Board. In addition, because Respondent did not advise Shamrock to seek the advice of independent counsel regarding these two agreements or obtain informed consent in writing to the essential terms of either agreement, the People claim that Respondent did not satisfy his obligations under Colo. RPC 1.8(a).
We first examine whether the management and lease agreements were fair and reasonable to Shamrock.
We initially turn to the management agreement. Respondent testified that the terms in the "Parties & Purpose" section of this agreement are fair and reasonable to Shamrock. He argued that it was reasonable for him to manage the corporation under his terms because none of his siblings were willing to do so. He explained that Lamont Miller lived out of state, Steve Miller was a fulltime caregiver to their mother, Mary Chapman was a "procrastinator," and Peggy Levinson was "too busy." In addition Respondent stated that since his return to Colorado it had always been his mother's intention that he would assume management responsibilities of Shamrock. Respondent explained that as part of his management duties, he intended to increase the mobile home park's revenues so that it could be sold and he and his siblings could walk away from the corporation with a profit. Further, he believed it was reasonable to include the "time being of the essence" term in the agreement in order to expeditiously resolve the management of Shamrock because his mother's health was rapidly declining.
He also argued that the compensation clause was fair to Shamrock because his salary was reasonable given his job duties-acting as a security guard for the mobile home park, executing leases, cleaning the grounds, performing general maintenance, and providing accounting, banking, and tax services. The "reach back" bonus provision was also fair, in Respondent's opinion, because his mother, Steve Miller, and Mary Chapman all agreed to this term. They agreed to pay Respondent a salary because he had put "seed money" into the TD Ameri-trade account initially; this allowed him to be compensated for that contribution. Respondent also contended that the liquidated damages provision was reasonable under the circumstances because it was a "sliding scale." For example, as Respondent explained, if there was a breach in month fifty-nine, he would only receive $4,000.00 in liquidated damages.[44]
We reject Respondent's contentions that the management agreement and its terms were fair and reasonable to Shamrock. We find the testimony of the People's expert witness Van Westrum persuasive. Van Westrum explained that because a board's managerial duties are governed by statute in Colorado, it cannot delegate those duties. Individual officers, such as the president or vice president, have no authority to act on behalf of a corporation unless they have been empowered by the board of directors to take such action. Thus, according to Van West-rum, neither Ms. Miller nor Respondent *1142 could execute the management agreement individually on behalf of Shamrock, nor could they delegate the management of Shamrock to an individual member of the Board. Additionally, Van Westrum testified that Respondent contravened Shamrock's articles of incorporation-which required disclosure of this transaction-and Colorado corporate law-which also required disclosure and the consent of the Board-when he neglected to seek Shamrock's consent to either transaction.[45]
Van Westrum also opined that the terms of the management agreement were unfair and unreasonable to Shamrock.[46] It was his opinion that many of the terms in the agreement were atypical and thus not reasonable. For instance, Van Westrum testified that the "emotional distress" clause was quite unlike anything he had ever seen in his career. The clause about procrastination was also curious to Van Westrum as the agreement itself did not describe how any such procrastination would be resolved.
Next, in Van Westrum's opinion the "Compensation" clause was unfair to Shamrock. Van Westrum was troubled by the highly unusual bonus structure. Under the agreement, Respondent received one-half of every measurable benefit he secured for the corporation. By the agreement's terms, Respondent was the only person responsible for measuring the benefit, which in turn would dictate how much he paid himself in bonuses. Van Westrum indicated that a fifty-percent bonus clause is unfair to a corporation under any circumstance because it is so substantial. Van Westrum further testified that the liquidated damages clause was unfair to Shamrock because only Respondent had the power to determine if a breach of the agreement had occurred. Any member of the Board who breached the agreement forfeited a judicial determination and was required to pay liquidated damages to Respondent in the form of a bonus and 200% of his salary.
We consider Van Westrum's opinions well-founded. The terms of the management agreement gave Respondent unfettered control of Shamrock, without the approval of the other members of the Board. Under the agreement, Respondent could use broad discretion to fulfill his duties. If any of his siblings interfered with him or criticized his choices, they would be in breach, penalized under the liquidated damages provision of the agreement and foreed to pay 200% of his salary and bonuses. The agreement, on its face, permits Respondent alone to determine what constitutes a breach of the agreement, which is not fair or reasonable to Shamrock. A breach provision such as this clearly benefits Respondent solely and thus is inequitable to Shamrock. Also inequitable was the provision of the agreement that permitted only Respondent to measure any benefit he bestowed upon the corporation in determining his bonuses. For these reasons, we find that the essential terms of the management agreement were neither fair nor reasonable to Shamrock.
We now examine the essential terms of the lease agreement. Respondent asserts that the terms of the lease agreement were fair and reasonable to Shamrock because he never actually lived in his mother's residence. It is undisputed, however, that Respondent had possession of the residence and that his siblings had to initiate formal eviction proceedings because he refused to vacate the premises. His siblings also provided persuasive testimony that $100.00 per month in rent was well below fair market value. Van West-rum agreed that the rental rate appeared to be unfairly low for the space, which included a home and an office. Also, it was unfair to Shamrock that Respondent could, and did, take $50.00 of the $100.00 in rent each month as a bonus. Because of this provision, Shamrock only netted $50.00 a month in rent for the property. For these reasons, we do not *1143 find that the essential terms of the lease agreement were fair or reasonable to Shamrock.
Next, we find that the People have proved by clear and convincing evidence that Respondent did not disclose or transmit the terms of either agreement in writing to Shamrock. Respondent conceded that he did not give the Board a copy of the management agreement prior to its execution, although he said he later tried to deliver a copy to his siblings. He testified that he brought a copy of the management agreement to Steve Miller at the duplex on four occasions but he was not permitted to come inside. Respondent next claims he drove the agreement to Mary Chapman’s house but was refused entry. He then resorted to placing an unsigned copy of the agreement on a table inside his mother’s house and on a shelf in the entryway. According to Respondent, the Board always placed important documents on this shelf. He reasons that his siblings knew to look thére for important documents and that this was sufficient disclosure. When asked on cross-examination why he failed to deliver a copy of the agreement to the Board, he stated that it was their practice in the past not to agree to anything. Such an answer suggests that Respondent did not make reasonable efforts to disclose the agreement to the Board because, as he himself attests, he would not have gotten the answer he desired. We disagree with Respondent that his paltry disclosure efforts satisfy his obligation under Colo. RPC 1.8(a).
Further, Respondent admits he did not advise Shamrock to seek the advice of independent counsel for either transaction. His justification for doing so—that there was no “physical Board” and that he was not notified of any meetings—is inadequate and contradicts his testimony that he attended regular Board meetings with his siblings and mother.
Finally, there is no dispute that Shamrock never gave written informed consent to the essential terms of either the management agreement or the lease agreement, because the Board never saw those terms. And we dispense with Respondent’s argument that the lack of written informed consent is acceptable because “each and every term” of
the management agreement, including his plan to run the business, was allegedly discussed at regular Board meetings from 2003 to 2010. To the contrary, all four of his siblings were adamant that they were not aware of either agreement until well after the agreements had been executed. We find their testimony credible and are not persuaded by Respondent’s argument. Based upon the analysis above, we find that Respondent violated Colo. RPC 1.8(a).
Dishonesty, Fraud, Deceit, and Misrepresentation—Colo.
RPC 8.4(c)
In their final claim, the People allege that by concealing the management and lease agreements from the Board and by failing to obtain its approval for the transactions, Respondent acted dishonestly in violation of Colo. RPC 8.4(c), a rule that prohibits lawyers from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. The People further contend that Respondent deceived the Board when he did not affirmatively disclose the transactions to the Board and refused to give Lamont Miller a copy of the management agreement. Finally, the People argue that Respondent was dishonest when he paid himself a salary and bonuses under an agreement to which the Board did not consent.
Respondent disagrees. He claims that the terms of the agreement were openly discussed at Board meetings for over seven years, and that his mother, as Shamrock’s president, consented to the agreement. He further contends that he attempted to disclose the management to Steve Miller and Mary Chapman on several occasions but was denied entry to their homes. He also faults his siblings for failing to locate the agreement, which he placed on a shelf inside his mother’s home.
We find that the People have proved by clear, and convincing evidence that Respondent’s conduct did, in fact, contravene Colo. RPC 8.4(c). Respondent knowingly engaged in dishonest conduct when he concealed and failed to disclose to the Board the two agreements prior to their execution. The facts show that Respondent, upset that he and his *1144 siblings could not agree on Shamrock's management, drafted the management agreement three days after arguing with Steve Miller and Mary Chapman. He deliberately chose not to disclose the management agreement to the Board because he wanted to give himself unrestricted control over the corporation and he knew his siblings would not agree to the transaction-because, in his words, it was their practice not to agree to anything. He then engaged in additional dishonest conduct when he paid himself a salary and bonuses while concealing the agreement from his siblings. He knew the Board had not approved the agreement, yet paid himself anyway.
Finally, Respondent also was knowingly dishonest when he drafted the lease agreement in secret and rented to himself his mother's former residence and office for a mere $100.00 a month-an amount below fair market value-without disclosing these terms to the Board or seeking its consent. He did not disclose this agreement because he knew the Board would not approve it. As Shamrock's attorney and as a member of its Board, Respondent had a duty to Shamrock to disclose these interested transactions, not to conceal them. These actions violate Colo. RPC 8.4(c).
IV. SANCTIONS
The American Bar Association Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA Standards") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[47] When imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.
ABA Standard 3.0-Duty, Mental State, and Injury
Duty: Respondent acted in contravention of his duties of loyalty and candor to his client Shamrock. Respondent did not act in Shamrock's best interest while he was representing the corporation and entered into two interested business transactions, neither of which was fair or reasonable to Shamrock. He ignored his duties by failing to seek Shamrock's consent to the transactions or to the concurrent conflict of interest. He also deceived Shamrock by concealing the management and lease agreements and by executing those agreements without the Board's consent.
Mental State: We conclude that Respondent acted knowingly [48] when he entered into agreements that posed conflicts of interest, did not disclose these conflicts to his client Shamrock, and placed his own personal interests above those of Shamrock. He also knowingly entered into two business transactions with Shamrock, both of which included unfair and unreasonable terms. He then knowingly failed to advise Shamrock to seek independent counsel and to obtain Shamrock's written informed consent to the essential terms of each transaction. Finally, Respondent knowingly concealed the two agreements from the Board and knowingly failed to obtain the Board's consent to the two transactions.
Injury: The management agreement caused Shamrock actual injury. Respondent paid himself a salary and bonuses under the terms of the undisclosed and unapproved management agreement. These payments harmed Shamrock because they were obtained unfairly. Then, in order to enforce the agreement, Respondent filed a declaratory judgment action against his siblings, causing them to incur significant attorney's fees. Legal resolution of the management agreement caused ill will among the family members, according to the siblings' testimony, and forced each of them to expend a signifi *1145 cant amount of personal time to resolve the issues.
The lease agreement also harmed Shamrock and its Board. By charging himself $100.00 a month to rent his mother's former home and office, he caused actual injury to Shamrock by depriving it of fair-market-value rental income. He then paid himself $50.00 as a bonus for each payment, further reducing Shamrock's net profit. Steve Miller testified that Shamrock never received any of this rental income. Because Respondent ' never sought the Board's permission to enter into the lease agreement, the Board was forced to initiate eviction proceedings to remove him from the property. According to the siblings, this legal proceeding triggered significant attorney's fees and costs. The eviction proceeding also caused substantial strife among the family members and detracted from their personal time.
ABA Standards 4.0-7.0-Presumptive Sanction
Suspension is the presumptive sanction for Respondent's misconduct, as set forth in two ABA Standards. The Hearing Board first looks to ABA Standard 4.32, which governs Respondent's violation of Colo. RPC 1.7(a)(2) and 1.8(a). That standard provides for suspension when a lawyer knows of a conflict of interest and does not fully disclose to the client the possible effect of that conflict, causing injury or potential injury to the client. Under ABA Standard 4.62, suspension is generally appropriate when a lawyer knowingly deceives a client and causes the client injury or potential injury.
ABA Standard 9.0-Aggravating and Mitigating Factors
Aggravating circumstances include any considerations or factors that may justify an increase in the degree of the presumptive sanction to be imposed, while mitigating circumstances may warrant a reduction in the severity of the sanction[49] The Hearing Board considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction.
Dishonest or Selfish Motive-9.22(b): Respondent acted with a dishonest and selfish motive when he secretly executed the management and lease agreements with the intent to financially benefit himself and to retain control over the family corporation. We consider this a significant factor in aggravation.
Multiple Offenses-9.22(d): Although Respondent violated Colo. RPC 1.7(a)(2), 1.8(a), and 8.4(c), his violations of these rules arise from the same common nucleus of operative facts. Thus, we decline to impose this factor in aggravation.[50]
Refusal to Acknowledge Wrongful Nature of Conduct-9.22(g): Although Respondent testified at the hearing that he recognized he may bave breached the rules, this statement is at odds with his other testimony. During closing argument, he stated that he should not be penalized for failing to seek the Board's consent to the two transactions at issue because the Board refused to approve anything. He insisted that he was unable to provide the Board with proper notice because it refused to listen to him and did not cooperate with the president. He continued to maintain that he was caught in between a "rock and a hard place," as he believed he . was required to follow his mother's request that he manage the corporation. Respondent continues to insist that his conduct was proper, and in closing, he even asked the Hearing Board to explain to him how he could have avoided a sanction under these cireumstances. Accordingly, we give this aggravating factor substantial weight.
Substantial Experience in the Practice of Law-9.22(): Respondent has been licensed in Colorado since 1989. His misconduct reflects poorly on such a longstanding practitioner, and we apply this factor in aggravation.
*1146 Absence of a Prior Disciplinary Record-9.32(a): Respondent has been licensed to practice law since 1989 with no instances of discipline, a fact that merits consideration in our analysis. ~
Full and Free Disclosure to Disciplinary Board or Cooperative Attitude Toward Proceedings-9.32(e): The People indicate that Respondent has cooperated with them throughout this disciplinary proceeding, and they do not object to application of this factor. We therefore give Respondent credit in mitigation for his cooperation.
Character or Reputation-9.82(g): Two witnesses testified as to Respondent's character. - First, Gayle Young testified that she has known Respondent for over twenty years and has the highest regard for him. She first met Respondent when they were independent contractors working for a law firm. Over the past twenty years, she has hired Respondent to prepare her business and personal taxes. She testified that she has always found him to be honest and reliable; she would not have allowed him to file her taxes for so many years had she not thought so. Young stated that Respondent is currently serving as a guardian ad litem for children in Arkansas. When she heard that he was practicing in this area, she was initially surprised because she knows him as a business lawyer. From what Young has observed, however, Respondent is great with kids, is able to "get down" to their level, and can relate well with them. She finds that Respondent takes pride in his work and enjoys working with children.
Next, David Zen testified about Respondent's character. Zen is married to Young and has also known Respondent for over twenty years. Like his wife, Zen has hired Respondent to prepare his personal and business taxes for many years. He has also maintained a close family relationship with Respondent. Respondent assisted Zen and his wife when they set up their law practice in 1997, and he prepared the necessary filings and taxes. Zen trusts Respondent completely with his financial information. During the years Zen has known Respondent he has never seen him engage in any dishonest conduct, and he believes Respondent takes his obligations as a lawyer seriously, with a clear idea of his duties. Like Young, Zen finds that Respondent is well-suited for the ad litem work he is doing in Arkansas and hopes that Respondent continues to pursue this practice. He has, however, known Respondent to "get too caught up in a fight."
Although Respondent's character witnesses spoke highly of his tax preparation and current legal work in Arkansas, not one testified about the subject of this complaint. Thus, they were unable to offer incisive testimony about Respondent's good character as, applicable to this mitigating factor. We therefore give this factor comparatively little weight.
Analysis Under ABA Standards and Colorado Case Law
The Colorado Supreme Court has directed us to exercise our discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[51] mindful that "individual cireumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases." [52] The presumptive sanction may be increased or decreased not only in light of aggravating and mitigating factors, but also in consideration of the Colorado Supreme Court's disciplinary jurisprudence.[53] Ultimately, although prior cases are helpful by way of analogy, a hearing board should determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.
The People seek imposition of a ninety-day suspension for Respondent's misconduct conduct. They point us to In re Cimino[54] and *1147 People v. Mason [55] in support of their request.
In Cimino, a lawyer for a corporation loaned it money, thereby entering into a prohibited business transaction.[56] Like Respondent, Cimino, who served as a director of the corporation, was the only lawyer among the four shareholders.[57] Cimino did not adequately advise the other shareholders to obtain independent counsel, did not notify them of his conflict of interest in being both corporate counsel and a creditor of the corporation, and did not obtain written consent of the shareholders to waive the conflict.[58] Cimi-no then sued the corporation on his promissory note, forcing the corporation to retain a lawyer in defense[59] Considering three aggravating factors and three mitigating factors (and emphasizing, in particular, his remorse), Cimino's knowing state of mind, as well as the injury to the corporation, the Colorado Supreme Court imposed a thirty-day served suspension.[60]
In Mason, a lawyer accepted his client's transfer of a cabin in exchange for settling his client's past-due legal fees.[61] A hearing board determined that the attorney's representation of his client was materially limited by his personal interest in keeping the client's cabin for himself.[62] The attorney also engaged in dishonest conduct when he attempted to mislead the court into believing his client had not transferred his interest in the eabin.[63] In light of the lawyer's knowing mental state, five aggravating factors, and three mitigators, including no prior discipline in thirty-five years of practice, the Colorado Supreme Court suspended the lawyer for six months.[64]
In this case, the People ask for a ninety-day suspension. Nevertheless, the Hearing Board exercises its independent discretion and finds that a longer period of suspension is warranted. We reach this conclusion considering the aggravating factors, which outweigh the mitigating factors, as well as Cimi-no and Mason, which help us to gauge the appropriate sanction here. Though Cimino provides useful guidance, it does not address-unlike the instant matter-conduct involving dishonesty, fraud, deceit, or misrepresentation. Also, unlike the lawyer in Cimi-mo, Respondent has expressed no remorse for his conduct. With the presence of true remorse, and in the absence of a Colo. RPC 84(c) charge in this matter, Cimino might suggest that a ninety-day suspension here would be reasonable. However, because Respondent has expressed no remorse and because this case involves a finding of dishonesty, we look instead to the sanction in Mason, where the lawyer's conflict of interest was coupled with dishonest conduct, as a better benchmark. While we recognize that much of Respondent's misconduct can be attributed to familial antipathy, our sanctions determination is ultimately swayed by the outrageous provisions Respondent crafted in the management agreement; Respondent used his legal training and law license to enact terms that not only advantaged him but also appear to have had a retributive intent-to punish his siblings for all past slights and any future annoyances. We therefore conclude a suspension of six months is a more fitting sanction for Respondent's misconduct. Respondent shall also be required to take and pass the Multistate Professional Responsibility Exam before seeking reinstatement pursuant to C.R.C.P. 251.29(b).
V. CONCLUSION
Respondent violated his duties to his client to provide conflict-free representation. His independent judgment was clouded by his own personal interests in the two transactions that he concealed from the Board. His *1148 misconduct calls for a six-month suspension, with his reinstatement subject to passing the Multistate Professional Responsibility Exam.
VI. ORDER
The Hearing Board therefore ORDERS: 1. PAUL FARRIS MILLER, attorney registration number 18925, is SUSPENDED FOR SIX MONTHS. The suspension will take effect upon issuance of an "Order and Notice of Suspension." [65]
Should Respondent wish to resume the practice of law, he will be required to submit to the People, no more than twenty-eight days prior to the expiration of the period of suspension, an affidavit complying with C.R.C.P. 251.29(b). Before submitting an affidavit pursuant to C.R.C.P. 251.29(b), Respondent SHALL take and pass the Multistate Professional Responsibility Exam.
Respondent SHALL promptly comply with C.R.C.P. 251.28(a-c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.
Within fourteen days after the effective date of the suspension, Respondent SHALL comply with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the PDJ setting forth pending matters and attesting, inter alia, to notification of clients and of other jurisdictions where the attorney is licensed.
The parties MUST file any post-hearing motion or application for stay pending appeal with the Hearing Board on or before Friday, July 31, 2015. No extensions of time will be granted. If a party files a post-hearing motion or an application for stay pending appeal, any response thereto MUST be filed within seven days, unless otherwise ordered by the PDJ.
Respondent SHALL pay the costs of these proceedings. The People SHALL submit a "Statement of Costs" within fourteen days from the date of this order. Respondent's response thereto, if any, MUST be filed within seven days, unless otherwise ordered by the PDJ.

. See Vikman v. Int'l Bro. of Elec. Workers, Local Union No. 1269, 889 P.2d 646, 654 (Colo.1995) *1136 ("When considering a motion for a directed verdict ... a trial court must examine the evidence in the light most favorable to the non-moving party, including all reasonable inferences which may be drawn from the evidence in favor of the non-moving party.").

. Respondent's registered business address is 210 Carl Drive, #F-4, Hot Springs, Arkansas 71913.

. See C.R.C.P.251.1(b).

. Exs. S1-S2.

. Ex. Si at 00344.

. Stip. Facts 17.

. Ex. S1 at 00346.

. Stip. Facts 18.

. Stip. Facts 18.

. Stip. Facts 16.

. Stip. Facts 115.

. Ex. $3 at 00340.

. Ex. S3 at 00340.

. Ex. S3.

. Stip. Facts 113.

. Stip. Facts 114.

. ' Stip. Facts % 16; Ex. $4.

. Ex. $4.

. Stip. Facts I 17.

. Stip. Facts T 18.

. Stip. Facts 119.

. Ex. S6.

. Stip. Facts 122; Ex. S7.

. Ex. S7.

. Stip. Facts 125; Ex. $8. The case was styled Paul F. Miller v. Shamrock, Inc., et al., case number 11CV4364.

. Stip. Facts 131.

. Stip. Facts 131.

. Stip. Facts 131.

. Ex. S5.

. Ex. S5 at 000558.

. Ex. S5 at 000555.

. Stip. Facts 120.

. Stip. Facts N21.

. Stip. Facts 123.

. Stip. Facts 123.

. Stip. Facts 24.

. Stip. Facts 126. The case was styled Shamrock Inc. v. Paul F. Miller and Law Office of Paul F. Miller, case number 11€1354.

. Stip. Facts 127.

. Stip. Facts 11 29.

. Colo. RPC 1.7(a)(2).

. Colo. RPC 1.7(b)(1), (4).

. Colo. RPC 1.7 cmt. 10.

. Stip. Facts T 31.

. Following Respondent's logic, however, if he had unilaterally determined that a breach occurred in the second month, he would-shockingly-have been entitled under the agreement to fifty-eight months' of twice the amount of his salary, or $232,000.00 in liquidated damages. A term such as this is clearly unfair to the corporation and its Board.

. Van Westrum also testified that many family-run corporations in general are managed less formally than non-family-run corporations. For example, it is common for family-run corporations to dispense with regular board meetings or to forgo formal notice of such meetings. Despite these informalities, Van Westrum testified, all interested transactions must still be disclosed and consented to by the uninterested directors.

. Colo. RPC 1.8(a) permits a lawyer to enter into a business transaction with a client provided, inter alia, that the transaction and its terms are fair and reasonable to the client.

. See In re Roose, 69 P.3d 43, 46-47 (Colo. 2003).

. The ABA Standards define knowledge as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards § III Definitions.

. See ABA Standards 9.21 & 9.31.

. See In re Roose, 69 P.3d at 49 (declining to find in aggravation multiple offenses where the attorney's rule violations involved two separate acts arising from the same lack of understanding and misguided perception of zealous advocacy in the same case).

. See In re Attorney F., 285 P.3d 322, 327 (Colo. 2012); In re Fischer, 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

. In re Attorney F., 285 P.3d at 327 (quoting In re Rosen, 198 P.3d 116, 121 (Colo.2008)).

. See In re Olsen, 326 P.3d 1004, 1011 (Colo. 2014).

. 3 P.3d 398 (Colo.2000).

. 938 P.2d 133 (Colo.1997).

. 3 P.3d at 398-99.

. Id. at 399.

. Id.

. Id. at 400.

. Id. at 400-02.

. 938 P.2d at 134.

. Id. at 136.

. Id. at 137.

. Id. at 138.

. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.